**K-V BUILDERS, INC., a corporation, Plaintiff-Appellant,**

v.

**Jefferson C. THOMAS et al., Defendants-Respondents.**

No. 30522.

St. Louis Court of Appeals.

Missouri.

Jan. 16, 1962.

Robert O. Snyder, Henderson, Heagney & Snyder, St. Louis, for appellant.

Dalton W. Schreiber, Kerth, Thies & Schreiber, Clayton, for respondents.

BRADY, Commissioner.

This is a suit to establish a mechanic's lien. Mr. Thomas and his wife were the owners of a house upon which the plaintiff contracted to put aluminum siding. Also named as defendants were J. Harvey Bennett, a workman on the house, and Ralph Hunsche and J. C. Lister, who were the holder of the note and the named trustee under a deed of trust and note which Mr. and Mrs. Thomas had previously executed to secure an indebtedness on their property. Mr. and Mrs. Thomas denied the allegations of the plaintiff's petition and counterclaimed, alleging that by reason of the failure of the plaintiff to do this work in a good and workmanlike manner the Thomases' house was damaged and lessened in value in the amount of $3,500.00, and prayed for judgment in that amount. Bennett filed a counterclaim against the plaintiff and a crossclaim against the other defendants in the amount of $180.69, and, of course, denied the allegations of plaintiff's petition. Plaintiff filed its answer to Bennett's counterclaim. Hunsche and Lister filed a separate answer of a general denial of plaintiff's petition and joined with the Thomases in denying the crossclaim of Bennett and also asserted therein an affirmative defense that Bennett's work " * * * was not done in a good and workmanlike manner, but the same was done in an inferior manner to the detriment of the value of the property * * *."

The pleadings are of importance to a proper consideration of this appeal. The petition alleges that the Thomases were " * * * justly indebted to the plaintiff in the sum of $2,479.46 for certain materials and labor furnished by this plaintiff at the special instance and request of and under contract with the defendants * * * " to be used on their property in St. Louis County which the petition goes on to describe with particularity, and further alleges that while the plaintiff was doing this work and furnishing the material to be used upon this property it was owned by the Thomases. A photostatic copy of the contract between the plaintiff and the Thomases was attached to the petition, marked "Exhibit A" and made a part of the petition by specific reference thereto. The pertinent parts of the contract, a copy of which was attached to the petition as Exhibit A and which was later identified and admitted into evidence, provides that the plaintiff was to

" * * * strip out entire above home preparatory to remainder of work. Insulated aluminum Korer Lum, color white, will then be placed over all outer walls of building boxing in around all windows and doors. Gables will have vertical aluminum color optional at owners' discretion. Caulk around all windows and doors painted wood molding around all windows and doors. * * * "

The price for the job was stated therein to be $2,680.00, and the contract also provided that the " * * * Contractor will do all said work in a good and workmanlike manner * * *." By leave of court, the plaintiff later amended to allege that the Thomases had ordered plaintiff's workmen off of the premises and to stop work and had thereby prevented completion of the contract, and the Thomases amended their answer to place this allegation at issue. The petition went on to also allege that an itemized account of "All of said materials and labor so furnished by the

plaintiff are fully set out in detail, fully itemized, showing the prices charged therefor, the amount still due, in the itemized account filed herewith and attached hereto and marked 'Exhibit B'." This account was then alleged to be a continuous and running account, the date the account accrued and became due was set forth. It was further alleged that this date was within six months prior to the filing of the plaintiff's lien, that all of the items shown on the account became a part of the billings on this property, that the price charged for each item was the reasonable value of that item, that the total due after allowing for all credits and setoffs was $2,479.46, that this amount was the reasonable worth of the total of the items, and that demand had been made upon the defendants on a date specified and within six months thereafter the plaintiff had filed the mechanic's lien verified by affidavit. Plaintiff prayed for judgment in the amount of $2,479.46, with interest at 6% from August 1, 1957, together with costs of suit and lien, and " * * * for a special judgment and decree on mechanic's lien * * *"; for a special execution against the property to satisfy the judgment, interest and costs; for an adjudication that this lien was superior to that of the deed of trust; that the rights of other claimants on said land be determined; that a sale be had and the proceeds thereof distributed according to the rights of the parties; and for any and all other " * * * proper and equitable relief to which the plaintiff and all other parties herein may be entitled."

The trial was by the court, which entered its judgment for all the defendants on plaintiff's petition and for Mr. and Mrs. Thomas on their counterclaim against the plaintiff in the amount of $500 and further found in favor of the other defendants as to Bennett's crossclaim against them, but found for that defendant on his counterclaim against the plaintiff in the amount of $180.69 with interest. The trial court refused to allow or grant the establishment of any liens, and costs were assessed against the plaintiff. No request was made of the trial court for specific finding of fact or conclusions of law.

■ The plaintiff's main contention on this appeal deals with its allegations, variously stated, that the evidence was insufficient to support the verdict. In considering this point, this court's review is to be upon both the law and the evidence, as in suits of an equitable nature, that is, de novo, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses, and while we will reach our own conclusion on the weight of the evidence, we are not to disturb the judgment unless it is clearly erroneous. Our final duty is to affirm the judgment or enter or direct such judgment as justice requires, Section 510.310 RSMo 1959, V.A.M.S.; Oliver L. Taetz, Inc. v. Groff, 363 Mo. 825, 253 S.W.2d 824; Beckemeier v. Baessler, Mo., 270 S.W.2d 782. Plaintiff also alleges prejudicial error in the trial court's ruling upon the exclusion of certain evidence and the admission of certain testimony.

Since we have determined that the plaintiff's contention that the evidence was insufficient to support the judgment is without merit, our recitation of the evidence will be limited to the testimony that, in our opinion, is of such probative value as to substantiate the trial court's verdict. The defendant Jefferson C. Thomas testified that the house in question is 67 x 28 ft. and has seven rooms including three bedrooms and a bath, and a two-car garage; that the stripping was nailed to the concrete blocks, and that one night when he came home he found a dent in one of the pieces of siding and upon inspection found that the siding was loose and the furring strips were as much as two to three cement blocks apart, each of the cement blocks being 16" long; that he talked to Perkins who was then working on the job about this matter, and also showed him where there were some spaces behind the blocks where there was no

furring strip, and after this discussion he told Perkins not to come back, and called up the plaintiff and told them to send a man out who knew what he was doing; that when these other men appeared they tore down what Perkins had put up and began to put in furring strips that would correspond to where the aluminum strips would come together; that when these men got the material out of the carton it was delivered in, they were not careful in doing so and scratched it up, with the result that there were kinks in the panels where they snapped together; that they finished the windows by cutting wood to fit and nailing it in with cement nails which could not be counterset in order to be puttied over, and left hammer bruises on the wood; that none of the frame around the windows was mitered but it was all rough cut; that the result was that it is impossible to take the screen in and out of the window they framed; that at the corner one of the strips was about 1/4" from being level with the strip coming from the other side of the house, and that there were spaces where a person could lay his finger in behind those strips at the corner; that the back doorsill that Bennett put in is higher on the outside than it is on the inside by over an inch, and it will have to be chiseled down or done all over. He further testified that he asked a representative of the plaintiff to get the material that they had left at the job out of the weather, and that when they did not do so he took the lumber and put it in a place where it was protected and that it is as good now as it ever was; that the material plaintiff's men took down, they reused, although they were requested to use new material; that clips are nailed to the furring strips and this aluminum is attached to the furring strips by means of these clips but in one particular area the clips are not hooked on to the siding.

On cross-examination, Mr. Thomas admitted that the stripping was corrected so that it is now on 16" centers on "Most parts of the house"; that he finally refused to let the plaintiff do any more work on this job; that Foglesong told him he could not box in the windows; that Bennett told him he never did this type of work before; that one window was left so that rain and snow had been getting in and the whole wall is going to have to "* * * have something done to it when this is settled"; that four gables on his house, one at each end and one at each end of the garage, the east side of the house, and the other three sides above the trim board just below the eaves have not had siding applied; that there were metal awnings that had to be taken down or loosened from the building to get the stripping and siding on that have not been replaced; and that the value of the house before the work started was $20,000 as compared to $19,000 immediately after the work was stopped.

Mrs. Thomas testified that the work started on the 29th of May and she tried to be home while the work was going on until she went to the hospital on June 7th, that Perkins began by taking down or loosening the awnings and then applying the stripping about 48 inches apart; that Perkins and a helper then began to apply siding; that she didn't remember how long it was before she asked him not to come back; that the work was all dented and marked where the men missed with the hammer; that Foglesong and a helper then worked applying siding to the back of the house and did four of the windows on the house and three on the garage; that Foglesong said he could not box the windows; that the wood around the windows was not mitered but was cut square and applied with concrete nails that could not be sunk into the wood; that the water runs into the house from the concrete sill built and can also get in around the window where spaces were left an inch below the framing; that the window screens cannot now be taken out or put in; that the corner pieces Foglesong put up were at least partially removed by Bennett and those that are still up do not come together at the bottom because the siding is one height on one side of the garage and another height

134

on the other; and that about one-third of the house has not been done. With respect to the concrete sills, she testified that these sills were slanted and very rough. Mrs. Thomas further testified that the same material taken off the house was reused, and that the workmen called the window framing a completed job. On cross-examination she testified that Perkins left at her request; that most of her conversation with Foglesong was with regard to the window framing; that the contract said nothing about the concrete sills, but the plaintiff offered to do this; and that Halpern asked her to let the plaintiff finish the house but she refused.

The defendants then offered the testimony of Mr. Goebel, who testified that he has been a registered architect for thirty years, that he also makes appraisals of houses; that in February or March of 1959 he examined this house and found the furring strips as far as 32 inches on center, which left the siding without a firm base, and by touching it you could push the siding into the wall; that in many places there was no backing where two pieces of siding met; that the concrete sills for the windows were substantial and properly installed, but the wood frame around the windows was " * * a very flimsy structure, not properly put up * * *", and were so constructed that you could not remove the screens to wash the windows; that a cement sill was " * * an inch or so higher * * *" than the floor; that the siding did not meet properly at the corners of the building, the siding on one wall being a half to three-quarters of an inch higher than the siding at the same level on the other wall, so that when the corner strips were applied there was a crevice or hole left; and that in his opinion furring strips should not be more than 16 inches apart with a piece of furring behind each place where the aluminum strips abut. The witness further testified over the objection of the plaintiff's counsel that the value of this house was $18,000 in May, 1957, and that in the condition he saw it in February or March of 1959, the value was

$17,500. He also testified that the awnings were not attached to the building when he inspected it, and that there was material lying around in the weather without any protection. It was his opinion that the work was not done in a good, workmanlike manner. On cross-examination Goebel testified that he had never used aluminum siding in designing a house or remodeling one; that he had inspected three or four houses with such siding; that where siding was applied and the job not finished weathering conditions would cause the insulation to deteriorate; that the fact that the wood framing for the windows was not painted would not cause the wood to swell so much that the screens could not be removed; that he made two measurements to determine the width of the stripping and found none 16 inches or less apart; that the corner situation he described could have been corrected.

The witness Rosenbaum testified that he is the vice president of the Better Business Bureau of St. Louis, Inc., and that at the request of the defendants he wrote to the plaintiff and received a letter in reply which he identified as Exhibit F. In that letter Halpern, president of the plaintiff, admitted that " * * * the workmanship was poor * * *" and stated that Mrs. Thomas " * * * has lost faith in our company because she has become very fussy and seems to be looking for fault. * * * While we admit that some of our workmanship was poor, we are doing everything in our power to correct this and give her a good job, as you can see. * * *"

The defendant Bennett was called by the plaintiff and testified that he was hired by plaintiff to work on the Thomas job in August of 1957; that he removed the siding in the front of the house and replaced it almost to the top; that he installed the concrete sills and " * * * There is nothing wrong with them * * *"; but he never got to finish them, being asked to leave the job by the Thomases, and that's why the sills were rough; that plaintiff was to pay him by the hour for the siding and by con-

tract for the sills; that he worked 24 hours on the siding and two days on the sills and hired another man to help him with them whom he had to pay; and that the total for the work he did was $180.69 which he has not been paid. On cross-examination Bennett testified that he had never put on aluminum siding before, and that he built the sill for the door higher on the outside because the ground is higher and this kept the water from coming in.

The pleadings have been set forth in some detail because of the disagreement that permeated the entire trial as to the basis for and theory of the plaintiff's petition; contract or quantum meruit. Since the contract contained a definite lump sum price agreed upon between the plaintiff and the Thomases for a completed job, the plaintiff could merely have stated the lump sum provided by the contract as a statement of account, State ex rel. St. Francois County Building & Loan Association v. Reynolds, 288 Mo. 522, 232 S.W. 1035. Had it done so, plaintiff would not have had to set out the various items of various materials furnished and labor performed, Mississippi Woodworking Company v. Maher et al., Mo.App., 273 S.W.2d 753. On the other hand, the contractor may recover for the materials it furnished and the work its employees did upon the house upon the theory of quantum meruit. Oliver L. Taetz v. Groff, supra. In a lien claim based upon this theory, it is not only proper but necessary to itemize the account, Fuhler v. Gohman & Levine Construction Co., Mo., 142 S.W.2d 482; Schroeter Bros. Hardware Co. v. Croatian "Sokol" Gymnastic Association et al., 332 Mo. 440, 58 S.W.2d 995. Since the plaintiff pleaded that the plaintiff was prevented from completing this contract by the actions of the Thomases, and itemized the account, we believe the plaintiff's petition proceeded upon the theory of quantum meruit, but it is actually immaterial because whether it be a theory of contract or of quantum meruit, the defense of improper or unskillful workmanship or, stated another way, that the efforts of the plaintiff re-

sulted in no increase in value to the property, was available to the defendants.

To bear its burden of proof, the plaintiff produced evidence establishing the contract which afforded prima facie evidence of the reasonable value of the services, John O'Brien Boiler Works Co. v. Sievert, Mo.App., 256 S.W. 555, at loc. cit. page 557 [1–5]; Cabool School District v. United States Fidelity & Guaranty Co., Mo.App., 9 S.W.2d 103, at loc. cit. page 105 [5, 6]; Oliver L. Taetz, Inc. v. Groff, supra, [5]; Beckemeier v. Baessler, supra. The defendants had pleaded that the work was unskillfully performed, and by their counterclaim alleged that it was not only worthless but actually resulted in the property being of less value than before the work began. Of course, such a theory of defense and counterclaim was available to the Thomases, Fitzgerald v. Schaefer, Mo.App., 216 S.W.2d 939 at loc. cit. pp. 940–941 [2, 3]; John O'Brien Boiler Works Co. v. Sievert, supra and cases cited at 256 S.W., page 557. Whether or not the materials furnished and work done by the plaintiff resulted in value being added to the property of the defendants was the crucial issue, and it is on that issue that the plaintiff's case fails. This is for the reason that there is no testimony in the plaintiff's case or anywhere in the record as to any increase in value in the Thomases' premises because of the work the plaintiff did, and the materials it furnished. To the contrary, the only evidence on this point is that the house was worth $1,000 less at the time work was stopped than it was when work began, according to Mr. Thomas' testimony, and $500 less, according to the expert witness Goebel's testimony. The plaintiff's contentions with regard to the admission of this testimony and the alleged exclusion of the lien can be disregarded as allegations of prejudicial error. Under our de novo review, this court considers such of the evidence as it deems admissible and excludes from consideration evidence improperly admitted. We are not required to rule upon the alleged er-

rors of the trial court with respect to the admission or exclusion of certain evidence, Section 510.310 RSMo 1959, V.A.M.S.; Rule 73.01(d), V.A.M.R.; Hussey v. Robison, Mo., 285 S.W.2d 603; Thumm v. Lohr, Mo.App., 306 S.W.2d 604. In any event, with respect to the alleged exclusion of the lien, an examination of the transcript discloses that the trial court reserved its ruling upon the defendant's objection to admission when it was offered and never did rule. The lien was filed as an exhibit and is part of this record. Moreover, the plaintiff's objection to the testimony of Goebel as to the value of the house was based upon the witness's admission that he had first examined the house in February or March of 1959, although he was asked and gave his opinion of the value as of May, 1957. The evidence was that Goebel had been engaged in his profession of architect for thirty years, and that he was also an appraiser, although he was never asked for how long he had been so. However, immediately following the objection Goebel was asked, "You have been making appraisals all through the years?" and answered, "Yes, sir." It is true that a number of questions intervened between his statement of thirty years experience as an architect and the question of "* * * making appraisals all through the years * * *", yet we think a fair inference is that each related to the other, and that he was making appraisals in May, 1957. As the summary of his evidence discloses, he gave factual basis for his opinion as to value by reciting in some detail what he found upon that inspection. He could therefore give his opinion as to value in 1957 based upon correlating what he saw upon inspection in 1959 with his knowledge of property values gained from making appraisals in 1957. When confronted with this evidence, the plaintiff's prima facie case of reasonable value arising from the introduction of the contract fails.

This transcript discloses ample evidence to substantiate the trial court's finding the work was not properly done. The evidence that the aluminum stripping did not meet at the corners and was dented and marked, that the screens could not be removed, that the furring strips were too far apart and not placed behind each point where the aluminum strips abutted, and the opinion by the expert witness Goebel that the work was not done in a good and workmanlike manner all substantiate the judgment. Moreover, in the face of diametrically opposed evidence, the solution would depend upon the credibility of the witnesses and thus present a factual situation that upon review calls strongly for the application of the rule of due deference, Fitzgerald v. Schaefer, supra; Spitcaufsky v. Guignon, Mo., 321 S.W.2d 481 at loc. cit. page 492 [12].

The trial court must have believed Goebel and Bennett when they testified that Bennett's work was properly done and on that basis awarded Bennett a judgment against the plaintiff who hired him. It could do so and at the same time believe the rest of the work was improperly done, and thus award judgment to the Thomases. These findings are not necessarily inconsistent, and are supported by the evidence.

The judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. The judgment is therefore affirmed.

ANDERSON, P. J., WOLFE, J., and HARRY A. HALL, Special Judge, concur.

RUDDY, J., not participating.