Charles B. McQUOID, Plaintiff,

v.

SPRINGFIELD NEWSPAPERS, INC., Defendant.

Civ. A. No. 77–3044–CV–S.

United States District Court, W. D. Missouri, S. D.

Oct. 31, 1980.

J. William Holliday, Kahoka, Mo., for plaintiff.

Lincoln Knauer, Springfield, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

COLLINSON, District Judge.

### I. FACTS

In 1973, plaintiff, Charles B. McQuoid, decided he would promote the building of the world's largest swine producing complex. The project would have required 5,000 acres of land, produced 2,400,000 hogs per year for slaughter, and would have comprised everything necessary for raising, slaughtering, and marketing hogs from the feed lot to the slaughterhouse. It would have been one of the three largest complexes of its type in the United States. Plaintiff decided to build the project somewhere in the three northern and easternmost counties of Missouri.

Plaintiff's proposal was a major piece of news. It would have had a substantial effect on the marketing of hogs. The proposal received publicity in newspapers ranging from the Kahoka Inquirer to the Wall Street Journal. More than 100 news articles concerning the project were published in 1973 and 1974.

Plaintiff expected objections to the project from his proposed neighbors. He wanted the objections aired and out in the open before embarking on the project. He scheduled two meetings, one in Scotland County and one later in Clark County and explained his ideas to assemblies which included members of county courts, prosecuting attorneys, banks and local chambers of commerce.

Plaintiff's idea caused great public concern, on the state and national level. The concern was manifested in various ways. A subcommittee of the Missouri House of Representatives issued a subpoena for him concerning the disposal of the hog waste. The Missouri House of Representatives also held public hearings in northeast Missouri on the same subject. The Federal Trade Commission wrote to plaintiff's land purchasing corporation, inquiring into the competitive aspects of the project. Plaintiff met with enforcement officers of the FTC. United States Senator Thomas Eagleton

made public references to the hog project in his speeches. Additionally, the CIA conducted an investigation of plaintiff because of rumors that foreign money was involved in the project. Plaintiff gave two speeches in Columbia, Missouri, to hog producing associations laying out his plan in detail. At one meeting he spoke for about an hour to an audience of 150 to 200 people. He explained his ideas, argued in favor of his project, and answered questions about his personal life including his prior bankruptcy and divorce.

The hog project concerned hog producers throughout the state of Missouri and the Midwest. Midwest hog producers had long feared vertically integrated hog projects and corporate farming in general. The hog project was the "topic of the day and was commented on before the weather" in 1973 and 1974. Discussions concerning the hog project continue today.

The Missouri Farmers Association (MFA), a statewide organization of farmers, monitored the situation closely. It kept in touch with news coverage of the event and with the University of Missouri Agriculture Department.

Plaintiff McQuoid obtained a loan commitment for the financing of $115 million of the estimated $100 to $200 million project. In order to get the funds committed he had to locate an adequate water supply. Plaintiff therefore arranged loans totaling $155,-000 for water exploration through two local banks in Kahoka, Missouri. To secure the loans, plaintiff arranged for the pledge of several drums of soil, stored in a bonded warehouse in Texas which came with an assayer's report showing them to contain valuable silver.

In the early part of 1974, one of the lending banks changed ownership. The new owners determined that an indepen-dent assay report was required. The independent assay report revealed that the pledged silver ore was valueless. Soon thereafter the banks demanded payment of their notes, but plaintiff had no money to pay them. An investigation by the FBI and lawsuits immediately followed with plaintiff confessing judgment in said suits. These events were widely reported in the media during the spring of 1974.

As soon as the valueless ore was revealed, plaintiff's northeast Missouri hog project failed. It could not be revived. In addition to the false ore, rising interest rates made the project unfeasible.

The FBI investigation concerning the pledged ore in the northeast project involved plaintiff McQuoid. He explained his involvement with the project and his connection with the bank loans. According to plaintiff, the FBI gave him certain oral assurances that he would not be prosecuted but refused to give him a written release. Additionally, the FBI refused to close its file on plaintiff due to the magnitude of the nationwide investigation.

In the fall of 1976, two years after the project failed, Harlan Phillips, special agent in charge of the St. Louis FBI office, made a speech at the Kirksville, Missouri Rotary Club. Phillips mentioned the work that the local agent had done on the bank fraud cases involving the hog project. In the speech, either on his own initiative or in response to a question from the floor pertaining to McQuoid or the project in general, Phillips allegedly said that indictments were expected soon in the matter.

The Hannibal Courier Post picked up that information and ran a story on October 13, 1976, to the effect that McQuoid was soon to be indicted by the government for his connection in the fraudulent ore scheme.[1] The Courier Post had broken the hog

---

1. The October 13, 1976 story in the Hannibal *Courier Post* entitled "FBI after hog complex organizer," stated in pertinent part:

Indictments are expected soon against Charles McQuoid, the man who attempted to organize a huge hog complex in Clark County, the Federal Bureau of Investigation (FBI) said.

Harlan Phillips, special agent in charge of the St. Louis office of the FBI, said McQuoid will be charged with making false statements to obtain loans.
McQuoid, a Chicago native, borrowed $105,-000 from The Exchange Bank of Kahoka and $50,000 from the Kahoka State Bank to finance the hog complex. . . .

project story and had been the lead newspaper. Its primary reporter, Dave Lammers, had written extensively about the project and at least one of his earlier stories had been picked up by the Associated Press wire service.

MFA director of public relations, Jack Hackthorn, received a copy of the Courier Post article and added it to their file on McQuoid and the hog project. Hackthorn kept in contact with farm and ranch editors throughout Missouri including Frank Farmer, farm and ranch editor of defendant Springfield Newspapers. Hackthorn routinely supplied Farmer with newspaper clippings on the hog project and other matters of concern to MFA and farm editors. Hackthorn mailed Farmer a copy of the October 13, 1976, clipping from the Courier Post within a day or two after the story had been published.

About three weeks later, on November 3, 1976, the Springfield Newspapers ran an article, the subject of this lawsuit, which was an editorial entitled, "All that Glitters" written by Farmer.[2] Farmer used the Courier Post clipping sent to him by Hackthorn as a basis for his article.

The Springfield Newspaper article states "McQuoid is being sought by the Federal Bureau of Investigation. Harlin Phillips of the St. Louis FBI office reported McQuoid is to be charged with making false statements to obtain loans." Plaintiff McQuoid alleges that the statement in the November 3, 1976, Springfield Newspaper article is untrue and defamatory and claims damages to his reputation. He also prays for punitive damages.

## II. APPLICABLE CASE LAW

In the landmark case of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that a public official may not recover damages in a defamation action unless he can prove from clear and convincing evidence that the publisher acted with "actual malice." Actual malice requires that the publication was made with knowledge of the statement's falsity or with reckless disregard for the truth. *Id.*, at 279–80, 84 S.Ct., at 725–726. The rationale being that a certain amount of defamatory material must be tolerated to remove "the pall and fear of timidity" which the threat of libel actions casts "upon those who give voice to public criticisms." *Id.*, at 276, 84 S.Ct., at 724. The result of the *New York Times* decision was the creation of a limited constitutional privilege for publications concerning public officials.

Three years after the *New York Times* decision, the Court extended the constitutional privilege to defamatory criticism of "public figures." *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The Court included in its definition of "public figures," non–public persons who are "nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id.*, at 164, 87 S.Ct., at 1996 (Warren, C. J., concurring in result).

In 1971, Mr. Justice Brennan writing for the plurality in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d

---

2. The November 3, 1976 editorial in the Springfield *Daily News* entitled "All that glitters," stated in pertinent part:

Remember Charles McQuoid?

No? Ah, how fleeting fame . . .

McQuoid was the Chicago magnate who electrified Midwest farmers three years ago when he proposed a hog production complex near Kahoka, Mo.-a complex that would farrow and finish millions of hogs per year.

Farmers were aroused because they smelled corporate agriculture at its worst, a plan to force family farmers out of business in droves. They protested from here to Washington and back again, and succeeded in getting some staunch official support.

But they need not have worried: McQuoid, it developed, could not obtain sufficient financing for his bold proposal and the plan died, leaving only aftermath in its wake.

Now, part of that aftermath has come to haunt the promoter. McQuoid is being sought by the Federal Bureau of Investigation. Harlan Phillips, of the St. Louis FBI office, reported McQuoid is to be charged with making false statements to obtain loans. . . .

296 (1971), extended the *New York Times* privilege to defamatory falsehoods relating not only to public officials and public figures but also *private persons*, if the statements concerned matters of general or public interest. Mr. Justice Brennan concluded that "if a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved." *Id.*, at 43, 91 S.Ct., at 1819. Therefore under the plurality opinion in *Rosenbloom* "a private citizen involuntarily associated with a matter of general interest has no recourse for injury to his reputation unless he can satisfy the demanding requirements of the *New York Times* test." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 337, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974).

In *Gertz v. Robert Welch, Inc., supra*, the Supreme Court replaced the *Rosenbloom* "public interest" approach with the more limited public official–public figure test of *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Additionally, it placed upon the states the responsibility of defining the standard of fault for defamation cases involving non–public officials or non–public figures. In its decision, the Court attempted to balance the interests of free speech in the press against the individual's interest in reputation and privacy. To protect the media, the Court disallowed any award of presumed or punitive damages against media defendants unless actual malice was shown.[3] *Id.*, 418 U.S., at 349–350, 94 S.Ct., at 3011–3012. Furthermore, private individuals could recover only those actual damages that were "supported by competent evidence concerning the injury." *Id.*, at 350, 94 S.Ct., at 3012.

■ The Eighth Circuit discussed this point recently in *Littlefield v. Fort Dodge Messenger*, 614 F.2d 581 (8th Cir. 1980):

> Public officials or figures can recover damages caused by defamatory falsehoods from media defendants only if they can demonstrate actual malice–i. e., that the publication was made "with knowledge of (the statement's) falsity or with reckless disregard for the truth." *Gertz v. Welch, supra*, [418 U.S.] at 342 [94 S.Ct., at 3008.] States may permit private individuals to recover damages from media defendants in accordance with a less stringent standard of culpability so long as state law does not "impose liability without fault." *Id.*, at 347, 94 S.Ct., at 3010 . . . .
>
> [But] only actual damages may be compensated by a showing of lesser fault. 614 F.2d, at 583, 584.

The result of the *Gertz* and *Littlefield* decisions is that in order to recover any damages, a public official or public figure must show that the libelous statement was published with actual malice–with knowledge of the statement's falsity or with reckless disregard for its truth. Under *Gertz* and *Littlefield*, a non–public official or a non–public figure must show actual malice before he may recover presumed or punitive damages from a media defendant.[4] A non–public official or a non–public figure suing any type of defendant for actual damages must show the libelous statement was published with that degree of fault as defined by appropriate state law.

The *Gertz* decision raised several issues. For example, the determination of what constitutes a public figure is vital. The *Gertz* Court defined public figures as

---

**3.** The question of whether the *Gertz* burden of proof standards apply to all defendants or merely media defendants is still open. While media defendants are unquestionably covered by *Gertz*, there is no language in the opinion specifically limiting the holding to *media* defendants. Because a media defendant is involved in the present case, this Court finds it unnecessary to address the issue of whether *Gertz* establishes burden of proof standards that must be present in *all* actions for defamation or merely actions against media defendants. This Court has previously held, however, that the *Gertz* standards apply in *all* defamation actions regardless of the *status* of the defendant. See *Rimmer v. Colt Industries Operating Corp.*, 495 F.Supp. 1217 (W.D.Mo.1980) (appeal pending).

**4.** See footnote 3, *supra*.

... those who ... have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved. In either event they invite attention and comment. 418 U.S., at 345, 94 S.Ct., at 3009.

Recently the Supreme Court reaffirmed the *Gertz* definition of public figure and elaborated upon the analysis to be used in determining whether individuals "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). Concluding petitioner was not a public figure under the *Gertz* definition, the *Wolston* Court looked at four essential elements.

First, *Gertz* as interpreted by *Wolston*, requires that the individual have reasonable access to the media to refute any false statement made about him. The Court stated:

> [W]e recognized [in *Gertz*] that public figures are less vulnerable to injury and defamatory statements because of their ability to resort to effective "self–help." They usually enjoy significantly greater access than private individuals to channels of effective communication, which enables them through discussion to counter criticism and expose the falsehood and

fallacies of defamatory statements. 418 U.S., at 344 [94 S.Ct., at 3009]; see *Curtis Publishing Company v. Butts*, 388 U.S., at 155 [87 S.Ct., at 1991] (plurality opinion); *Id.*, at 164 [87 S.Ct., at 1996] (Warren, C. J., concurring in result.) 443 U.S., at 164, 99 S.Ct., at 2706.[5]

Second, the Court implicitly required that the public controversy concerning the alleged defamation be newsworthy. While a public controversy is a necessary element, the Court noted that mere newsworthiness alone would not justify application of the *New York Times* actual malice test.

> A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention.[6] ... A libeled defendant must show more than mere newsworthiness to justify application of the demanding burden of New York Times. See, *Time, Inc. v. Firestone*, 424 U.S. 454 [96 S.Ct. 958, 47 L.Ed.2d 154]. 443 U.S., at 167–68, 99 S.Ct., at 2708.

Thus, a second element required by *Wolston* is that the public controversy concerning the alleged defamation be at least newsworthy.

Third, the Court stated that *Gertz* required an individual "voluntarily thrust" or "inject" himself into the forefront of a public controversy. A trial court must focus on the "nature and extent of an individual's participation in the public controversy giving rise to the defamation." 418 U.S., at 352, 94 S.Ct., at 3013. The Court concluded

---

**5.** The *Wolston* Court stated that the rationale for extending the *New York Times* rules to public figures was twofold. First, as stated above, public figures have greater access to the media. "Second, and more importantly, was a normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.' 418 U.S., at 345 [94 S.Ct., at 3010]; *see Curtis Publishing Co. v. Butts, supra* [388 U.S.] at 164 [87 S.Ct., at 1996] (Warren, C. J., concurring in result." 443 U.S., at 164, 99 S.Ct., at 2706.

**6.** The Court also stated:

> To accept such reasoning would in effect reestablish the doctrine advanced by the plurality opinion in *Rosenbloom v. Metromedia Inc.*, 403 U.S. 29, 44 [ 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296] (1971), which concluded that the *New York Times* standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this proposition in *Gertz* and in *Firestone*, however, and we reject it again today. *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S., at 167, 99 S.Ct., at 2708 (1979).

that petitioner Wolston had "only a minor role · in whatever public controversy there may have been." Thus, *Wolston* requires that an individual voluntarily thrust himself into the forefront of a public controversy in something other than a "minor role."

The final element required by the Court in *Wolston* is that the plaintiff voluntarily thrust himself into the public controversy *in an attempt to influence a resolution of the issues involved.* The Court stated that petitioner Wolston's failure to respond to a subpoena "was in no way calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue." 443 U.S., at 168, 99 S.Ct., at 2708.

■ Thus, in order to be a public figure under the *Gertz* decision as interpreted by the Court in *Wolston*, the plaintiff must voluntarily thrust himself in something other than a minor role, into a newsworthy public controversy, in an attempt to influence the resolution of the issues therein.

A second problem resulting from *Gertz*, is that many states have yet to define the appropriate degree of fault in order for a media defendant to be liable to a private individual. Indeed the degree of fault could run the spectrum from mere common law negligence[7] to the stricter actual malice standard of *New York Times.*[8]

Nevertheless, the *Gertz* opinion provides trial courts with an approach to analyzing defamation cases. First, the status of the parties must be determined. It must be established whether the plaintiff is a public official, public figure, or a private individual. Next, it must be determined if the defendant is a media defendant or a nonmedia defendant.[9] Finally, if it is established that the plaintiff is a private individual suing a media defendant, the applicable state law standard of fault must be ascertained and proved before the plaintiff may recover actual damages.

## III. THE CASE AT BAR

The Court begins with a determination of the status of the parties. Springfield Newspapers, Inc. is unquestionably a media defendant, and therefore plaintiff must establish, at the very least, actual malice before he may recover presumed or punitive damages.

7. The following states have employed the common law negligence standard: *Arizona, Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 315, 560 P.2d 1216, 1222 (1977); *Hawaii, Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 537, 543 P.2d 1356, 1366 (1975); *Illinois, Troman v. Wood,* 62 Ill.2d 184, 198, 340 N.E.2d 292, 299 (1976); *Kansas, Gobin v. Globe Publ. Co.,* 216 Kan. 223, 233, 531 P.2d 76, 84 (1975); *Maryland, General Motors Corp. v. Piskor,* 277 Md. 165, 171, 352 A.2d 810, 814–815 (1976); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 596, 350 A.2d 688, 697 (1976); *Massachusetts, Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 856, 330 N.E.2d 161, 164 (1975); *Ohio, Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 110, 334 N.E.2d 494, 497 (1974), *cert. denied,* 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Oklahoma, Martin v. Griffin Television, Inc.,* 549 P.2d 85, 89 (Okl.1976); *Texas, Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 812 (Tex. 1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *Washington, Taskett v. KING Broadcasting Co.,* 86 Wash.2d 439, 455, 546 P.2d 81, 85 (1976); *D. C., Phillips v. Evening Star Newspaper Co.,* 2 Media L.Rptr. 2201, 2206 (D.C.Super.Ct. June 30, 1977).

Furthermore, the following states have *implied* that they would use a *common law* negligence test: *Florida, Firestone v. Time, Inc.,* 332 So.2d 68, 69 (Fla.1976); *Georgia, Retail Credit Co. v. Russell,* 234 Ga. 765, 218 S.E.2d 54 (1975).

8. The following states have rejected use of the common law negligence standard as not providing adequate protection for a media defendant and therefore applied a stricter than mere negligence test: *Colorado, Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 96, 538 P.2d 450, 457, *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Indiana, AAFCO Heating & Air Cond. Co. v. Northwest Publications, Inc.,* 162 Ind.App. 671, 679, 321 N.E.2d 580, 586 (1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *New York, Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64–65, 341 N.E.2d 569, 571 (1975).

For excellent discussions of state defamation law since *Gertz*, see Frakt, Defamation Since Gertz v. Robert Welch, Inc.; The Emerging Common Law, 10 Rut.–Cam.L.J. 519 (1979); and Spencer, Establishment of Fault in Post–Gertz Libel Cases, 21 St. Louis L.J. 374 (1977).

9. See footnote 3, *supra.*

## A. *Punitive Damages*

The plaintiff has failed to show that the defendant acted with actual malice. Actual malice as defined by the Supreme Court, is either knowledge of the falsity of the published statement or reckless disregard for its truth. In his testimony upon cross examination, plaintiff admits he cannot prove defendant acted with knowledge of the statement's falsity.

Q. ... What fact, what evidence, what grounds for belief, do you, Charles McQuoid, have sitting there in the witness chair to say that Mr. Hilton, or Mr. Farmer or anybody at Springfield Newspapers had any kind of awareness that the article was false or might be false?

A. Just the article itself.

Thus, because plaintiff admits that neither defendant nor its employees acted with knowledge of the statement's falsity, he is limited to proving actual malice by showing that the defendant acted with a reckless disregard for the truth of the alleged defamatory statement. Plaintiff contends that a combination of circumstances show defendant's reckless disregard for the truth. The circumstances include (1) the predisposition of Mr. Farmer, writer of the article, to be opposed both personally and professionally toward plaintiff's project, (2) a lack of justifiable reliance upon the Courier Post article and, (3) Mr. Farmer's admission on cross examination that although the Courier Post article changed the tone of the entire reporting regarding the hog project, the change in tone did not prompt him to verify the veracity of the article, written by a reporter with whom he had no prior experience. When viewed together, plaintiff submits that the above circumstances show a reckless disregard for the truth of the facts published concerning the plaintiff.

Plaintiff McQuoid alleges that Mr. Farmer's predisposition to be opposed to plaintiff tends to show defendant's reckless disregard for the truth of the article. However, upon cross examination, Farmer stated that although he was personally opposed to this project, he was able to separate his personal opinions from his professional opinion and that he did so in this case.

As an additional indicia of defendant's predisposition against plaintiff, plaintiff asserts that the newspaper's failure to print any favorable development about him shows a reckless disregard for the truth of the published article. As an example, plaintiff states defendant failed to publish the fact that he was subsequently cleared of all criminal conduct. However, there was no showing that the newspaper had any knowledge plaintiff had achieved any favorable developments and thus no conscious decision by the newspaper not to publish such information. Indeed, upon cross examination, plaintiff testified that he never asked the defendant to print a retraction. Furthermore, assuming *arguendo* that defendant was aware of the favorable developments achieved by plaintiff, there is no authority holding that a conscious decision not to publish such events would constitute a reckless disregard for the truth of the original article.

Plaintiff also contends that defendant's reliance on the Courier Post article was not justified. However, the writer for the Courier Post had broken the story and been the lead writer on the story for a number of years. At trial Mr. Farmer, and other witnesses in the industry, testified that they placed strong reliance on the proven reputation of the Courier Post, particularly in the reporting of agricultural stories. In addition, the Courier Post articles concerning the hog project were picked up and used by the Associated Press on at least one occasion—events which several knowledgeable witnesses claimed was an indicia of reliability in the newspaper business. Furthermore, Farmer had dealt with the Courier Post for several years and always found the newspaper to be reliable.

Nor did plaintiff prove that defendant's method of relying on other newspapers' stories was unusual. On the contrary, defendant showed by uncontroverted evidence from witnesses knowledgeable in the customs and practices of the newspaper industry that the practice of picking up a non-

local newspaper story and relying on it, without further investigation, as a factual basis for its own story was customary in the newspaper business. All the witnesses stated that the hog project was not a local story for the defendant and that defendant's reliance on the Hannibal Courier Post was within the accepted customary practice of almost all newspapers. The Court believes that Mr. Farmer's reliance on the Courier Post article was neither unfounded nor unjustified.

Finally, plaintiff alleges that although the Hannibal Courier Post article changed the tone of the entire reporting on the hog project, defendant did not personally investigate the truthfulness of the Courier Post article. In essence with this allegation and with other allegations taken together, plaintiff is simply asserting that the defendant's failure to investigate the truthfulness of the Courier Post article establishes a reckless disregard for the truth.

Similar allegations were made by the plaintiff in *Gertz*. The Supreme Court noted, after reviewing the record, that the lower courts correctly concluded petitioner had failed to show by clear and convincing evidence that the managing editor of the publication knew of the falsity of the accusations made in the article. The Supreme Court praised the Court of Appeals by stating that the lower court "correctly noted that mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." Rather, the publisher must act with "high degree of awareness of ... probable falsity." *Gertz v. Robert Welch, Inc.*, 418 U.S., at 332, 94 S.Ct., at 3003, citing *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325–1326, 20 L.Ed.2d 262 (1968); accord, *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84–85, 88 S.Ct. 197, 199–200, 19 L.Ed.2d 248 (1967); *Garrison v. Louisiana*, 379 U.S. 64, 75–76, 85 S.Ct. 209, 216–217, 13 L.Ed.2d 125 (1964).

■ This Court does not believe that it should, nor under the guidelines of *Gertz* is it capable of awarding presumed or punitive damages for a defamatory statement published as the result of a media defend-

ant's failure to investigate the truthfulness of that statement. Nor is there any evidence whatsoever to indicate that defendant published the statement with a "high degree of awareness of ... probable falsity."

Plaintiff has admitted that defendant did not act with actual knowledge of the falsity of the statement and the plaintiff has failed to show defendant acted in reckless disregard of the statement's truthfulness. Thus, without a showing of actual malice plaintiff is not entitled to presumed or punitive damages.

### B. Actual Damages

In a suit for actual damages against a media defendant it must first be determined whether the plaintiff is a public official, a public figure, or private individual. Next the requisite standard of fault must be established. A public official or public figure must prove *New York Times* actual malice to recover actual damages. A private individual must show that degree of fault as defined by appropriate state law to recover actual damages. *See, supra.*

### 1. Public Figure Status.

■ A review of the facts indicates that plaintiff Charles McQuoid satisfied the Supreme Court's requirements for public figure status as defined in *Gertz* and *Wolston.*

First, testimony at trial revealed that plaintiff had and continues to have the type of easy access to the media that the *Gertz* Court contemplated. Tom Gross, editor of the Hannibal Courier Post, and Sam Burk, owner of a Kirksville, Missouri, radio station, stated that they would have granted McQuoid an interview in 1974, 1976, and now if McQuoid had simply asked. Likewise, Farmer, Dale Freeman, and Steve Hilton, employees or former employees of defendant, Springfield Newspapers, stated that they would have granted an interview to plaintiff in 1976. The Court need not reiterate the voluminous exhibits and trial testimony to conclude that plaintiff had the type of easy access to the media that the *Gertz* Court contemplated.

Plaintiff and his hog project were undeniably a public controversy. They were the subject of over 100 published articles, government regulatory and investigative scrutiny, politicians' speeches, and were, and continue to be, the subject of the citizens' daily comment. There can be little doubt that plaintiff and his project satisfied the second element as required by the Supreme Court in *Wolston*—that of a newsworthy public controversy.

Additionally, plaintiff voluntarily thrust himself into the hog project controversy in a *major* role. He was the hog project's promoter. He voluntarily spoke at public meetings. The nature and extent of his voluntary involvement in the controversy was clearly a very major one.

Finally, plaintiff thrust himself into the controversy in an attempt to influence the issues therein. Plaintiff testified that he attended public meetings and freely granted interviews with the media in an effort to persuade his audiences that the project would be beneficial to the proposed surrounding communities. He promoted the project's favorable economic impact before the FTC. The very essence of his role as promoter was to influence the resolution of issues concerning the hog project.

■ Thus, it is this Court's opinion that plaintiff was a "public figure" as defined by *Gertz, Littlefield* and *Wolston*. Accordingly, plaintiff, as a public figure must show that defendant acted with actual malice to recover actual damages. As discussed, *supra* plaintiff has failed to make such a showing. However, while it is the opinion of this court that plaintiff was a public figure and has failed to show the requisite degree of fault on the part of defendant,

the importance of this determination is negated by the fact that plaintiff failed to prove any actual injury whatsoever. *See, infra.* Therefore, regardless of plaintiff's status, he is not entitled to an award of actual damages.[10]

### 2. *Actual Injury.*

■ "It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for truth to compensation for actual injury." 418 U.S., at 349, 94 S.Ct., at 3012 (1974). The *Gertz* Court did not define, however, "actual injury." Instead, it gave wide latitude to trial courts to frame the appropriate standards. *Id.*, at 350, 94 S.Ct., at 3012. "Suffice it to say that actual injury is not limited to out-of-pocket loss." *Id.* The more customary types of injury actually inflicted by defamatory falsehoods are "impairment of reputation, standing in the community, personal humiliation, mental anguish and suffering," *id.*, and "all awards must be supported by competent evidence concerning the injury." *Id.*

Plaintiff's attempts to prove these types of actual damages was futile. First, Mr. O. J. Nicholson responded on cross examination that the Springfield article did not lessen his opinion of the plaintiff. Second, plaintiff testified that he felt his reputation had been damaged and that the article had been read by his friends. He stated that this caused him some embarrassment because it was mentioned by an individual who had read an article concerning plaintiff. However, plaintiff could not say whether it was the Springfield article, which the individual read, or the Courier Post article or a Quincy, Illinois, newspaper

---

**10.** While this Court finds it unnecessary to reach the issue of the degree of fault required for private plaintiffs to recover actual damages from media defendants, the Court notes that the standard under Missouri law is unsettled. *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) requires that state libel law define the requisite degree of fault in such cases as long as the states do not impose liability without fault. Thus, states must require defamation plaintiffs to prove at least negligence in the publication of defamatory false-

hoods—they may require more. See footnotes 7 and 8 and accompanying text. The Missouri courts have yet to decide the degree of fault required under *Gertz* for private individuals suing media defendants. Even assuming that Missouri would adopt the negligence standard, it appears that plaintiff failed to make even that showing. The evidence shows that defendant Springfield Newspapers, Inc. exercised that degree of care which is customary in the newspaper industry. For a similar analysis, see 614 F.2d at 584 n. 4.

article. Therefore, plaintiff could not directly relate any embarrassment he suffered to the defendant's article. Finally, plaintiff stated that he felt his reputation with Clell Carpenter of MFA was injured. However, as plaintiff admits in his post–trial brief, Mr. Carpenter denied that such was the case and stated that he did not feel that the Springfield article lowered any further his opinion of Mr. McQuoid. It should be noted that Carpenter had read the Hannibal and Quincy newspaper articles before ever reading essentially the same story in the Springfield newspaper.

Plaintiff's failure to directly link any embarrassment he suffered to the defendant is important. In *Littlefield*, the Eighth Circuit held that the plaintiff "failed to prove any actual damage resulting from the article" when he could not directly relate his employment dismissal to the alleged defamatory publication. 614 F.2d, at 584 (1980).

Plaintiff has presented no proof of any damage to his reputation, from any witness, resulting from the defendant's article. Under the *Gertz* decision and under the *Littlefield* application of that decision, this Court may not presume any damages to plaintiff's reputation. Rather plaintiff has the burden of proving such damages by competent evidence. 418 U.S., at 350, 94 S.Ct., at 3012. Furthermore, plaintiff has not come forward with any evidence that he suffered the other types of actual injuries contemplated by *Gertz*. *See, Id.*

In the absence of any proof of damages, the Court can only resort to speculation, conjecture and surmise as to what, if any, damages were suffered by the plaintiff. And under *Gertz*, the Court may not presume any such damages nor may it resort to speculation. Punitive damages cannot possibly be recovered in the absence of a showing of *New York Times* actual malice and the Court has already decided *supra*, that plaintiff has failed to make out a case supporting such a finding. Furthermore, plaintiff has failed to show that he suffered any actual injuries resulting from the publication of the defendant Springfield Newspapers' article of November 3, 1976, and he is therefore not entitled to actual damages.

For the reasons set forth above and in the best interests of justice, it is

ORDERED, that judgment be entered in favor of defendant Springfield Newspapers, Inc. and against plaintiff Charles B. McQuoid.