Elmer E. **WHITMORE, Jr.,** Plaintiff-Appellant,

v.

The **KANSAS CITY STAR COMPANY,** Defendant-Respondent.

No. **KCD 26089.**

Missouri Court of Appeals, Kansas City District.

July 23, 1973.

Motion for Rehearing and/or Transfer Denied Sept. 4, 1973.

Robert J. Barbieri, and Commodore M. Combs, Jr., Kansas City, for plaintiff-appellant.

David R. Hardy, John T. Martin, Robert E. Northrip, Shook, Hardy, Mitchell & Bacon, Kansas City, for defendant-respondent.

Before DIXON, C. J., PRITCHARD, and SOMERVILLE, JJ., and DONALD B. CLARK, Special Judge.

SOMERVILLE, Judge.

Elmer E. Whitmore, Jr.'s action against The Kansas City Star Company is predicated on libel per se. The purported malediction was contained in an article published on July 29, 1967, in the "Times Edition" of The Kansas City Star Company.

Whitmore was employed by the Jackson County Juvenile Court as a Deputy Juvenile Officer in the Foster Home Department. Homer Ontman, who also figured prominently in the article, was likewise an employee of the Jackson County Juvenile Court, although working in a different department. The "backdrop" for the complained of article was a series of articles

by the Star concerning operation of the Jackson County Detention Home and a grand jury investigation of the home.

The article complained of bore the following headline: "Use Boy As Lever In Controversy". Cut to the marrow the article reported: That a fourteen year old boy, who was a ward of the Jackson County Juvenile Court, "was used as a pawn" to "hold down adverse publicity about the Jackson County parental school"; that the fourteen year old boy, who had been placed in the Ontman home, was removed therefrom by the efforts of Whitmore; that Ontman, in reference to Whitmore, was quoted as saying, "He told me that if I would resign from my position at the parental school and quit talking, I could have the boy back."; following an article in the "Star Edition" of defendant reporting on the grand jury's findings concerning the Jackson County Detention Home, Ontman, in reference to Whitmore, was quoted as saying, "He told me this time that I would not have a chance of ever seeing the boy again." . . . "He said I had gone too far with this thing and it would not be possible for the boy to come back in my home. He said I should have taken the first offer and all the trouble would not have come about."; when questioned by the scrivener of the article, concerning the purported statement by Ontman attributed to Whitmore, Whitmore "agreed to the substance of the conversation and agreed he had made the original offer, and then the second call", and, further, that he (Whitmore) "was considering placing the boy back at Ontmans."; additionally, the article reported Whitmore as saying, "I told him if things quieted down he (sic, the boy) might be able to go back."; moreover, during the questioning of Whitmore by the scrivener of the article, Whitmore was quoted as saying, "I told him (sic, Ontman) the boy was being used as a pawn and I was not going to put that boy back there.", the context of which was that Ontman was using the boy as a "pawn"; the article further reported that a Deputy

Juvenile Officer could only make recommendations to the Juvenile Court concerning placement of wards of the court, however, Whitmore was quoted as saying, "Most of the time" such "recommendations are followed" and the fourteen year old boy who had been removed from the custody of Ontman was placed in another foster home "on Whitmore's recommendation."

The trial court, over the objection of Whitmore, excised and excluded from the jury all of that part of the principal article following the sub-headline "To Hold A Hearing". The excised portion reported that the day preceding publication of the article the Judge of the Juvenile Court of Jackson County had ordered a hearing to investigate the matters reported in the principal article. There was absolutely no contention on Whitmore's part that the matters reported in the excised portion of the article were untrue or inaccurate. Although Whitmore claims prejudicial error resulting from the excision, controlling disposition of the case makes it unnecessary to rule the point.

At the close of Whitmore's evidence, the Star filed a motion for a directed verdict which was sustained by the trial court and judgment was rendered in favor of the Star. Whitmore duly perfected his appeal.

Slander, since the time of Adam and Eve, together with libel since Johann Gutenberg invested the printing press, have met in head on confrontation with mankind's inherent belief in freedom of oral and written expression. The genesis for mankind's inherent belief in freedom of expression was, and continues to be, that unfettered freedom of expression serves the greater good of a majority of the people, as opposed to serving the smaller good of a minority of the people by its stiflement. Involved, almost inexorably, in the determination of this, or any other, libel action, is which way do the scales of justice tip, in favor of the scrivener by virtue of mankind's inherent concept of freedom of speech and press, or in favor of the ma-

ligned by virtue of mankind's opposing concept of vindication of honor and redress for injury. Voltaire expressed the concept of freedom of expression in the extreme when he wrote, "I disapprove of what you say, but I will defend to the death your right to say it." Conversely, there exists a galaxy of libel decisions, in this and other states, placing the burden of showing truth of the publication on the publisher (however good his intent), and void of any requirement as to proof of malice save only with respect to punitive, but not actual, damages. The First Congress of the United States, on September 25, 1789, proposed to the Legislatures of the several States the first Ten Amendments to the Constitution of the United States, same comprising the Bill of Rights. It is surely not without note that the First Amendment proscribed any law that abridged freedom of speech and press. Subsequently, the Fourteenth Amendment proscribed the various states from abridging freedom of speech and press as mandated by the First Amendment.

The underlying philosophy of the broad latitude attached to the First Amendment's guarantee of freedom of the press found eloquent expression in the words of John Marshall, which were quoted with approval by James Madison, 6 Writings of James Madison 1790–1802, p. 336 (G. Hunt ed. 1906):

"'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.'"* (Emphasis in original.)

Chief Justice Hughes in DeJonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278 (1937) tersely stated the underlying philosophy inherent in the First Amendment's quarantee of freedom of speech and press in the following words:

"(I)mperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

Until New York Times Company v. Sullivan, 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), courts literally groped for some measurable standard with which to strike a legally acceptable balance between freedom of the press on the one hand and vindication of individual honor and redress for injury on the other hand. It is appropriate to point out that media irresponsibility undoubtedly allayed —and continues to do so—ultimate resolve of whether the First Amendment is to be literally applied to all written and oral expression in this country. But be that as it may, New York Times Company v. Sullivan, supra, laid down the following mandate applicable to state court libel actions involving public officers:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was

false or with reckless disregard of whether it was false or not."

Subsequently, the "actual malice" rule was made applicable in 1967 to libel actions brought by public figures (Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967)), and in 1971 to libel actions brought by individuals involved in events of public or general interest (Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)). This case clearly falls within the controlling purview of New York Times v. Sullivan, supra, Curtis Publishing Company v. Butts, supra, and Rosenbloom v. Metromedia, Inc., supra.

■ New York Times v. Sullivan, supra, Curtis Publishing Company v. Butts, supra, and Rosenbloom v. Metromedia, Inc., supra, a trilogy of libel, after careful analysis, force the conclusion—prior legal concepts applicable to the law of libel in this state aside—that the rule of "actual malice" imposes upon a party claiming to have been libeled the burden of proving by "clear and convincing" proof the falsity of the purported defamatory article, and, additionally, that the false and defamatory article was published "with knowledge that it was false, or with reckless disregard of whether it was false or not." Additionally, in St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Supreme Court of the United States imposed a further refinement on the weighty burden resting on a party claiming libel with respect to the elusive standard of determining whether or not the scrivener's conduct was reckless:

> "(R)eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to truth of his publication."

The rationale for the "actual malice" rule—and the consequent weighty burden of proof imposed upon one claiming libel —is to preclude the First · Amendment's guarantee of freedom of speech and press from being a debilitated guarantee because of "self censorship" fostered by fear of financial retribution. New York Times Company v. Sullivan, supra.

■ The criterion for appellate review is clearly mandated by the Supreme Court of the United States in Rosenbloom v. Metromedia, Inc., 403 U.S. at 54, 91 S.Ct. at 1825:

> "The simple fact is that First Amendment questions of 'constitutional fact' compel this Court's *de novo* review." (Emphasis in original.)

Constitutional facts, necessarily, are those determinative of whether an alleged defamatory article was published with "actual malice" in the constitutional sense. This court subscribed to the principle of reviewing "questions of 'constitutional fact'" de novo in libel cases in Rowden v. Amick, 446 S.W.2d 849 (Mo.App.1969).

■ De novo review, appellate-wise, has certain attendant principles, not the least of which are that the reviewing court will defer to the findings of the trial court as to controverted factual matters involving the credibility of witnesses, and will not disturb the ruling of the trial court unless it is clearly erroneous. Peerless Supply Company v. Industrial Plumbing & Heating Company, 460 S.W.2d 651 (Mo.1970); K-V Builders, Inc. v. Thomas, 353 S.W.2d 130 (Mo.App.1962); Craft v. Politte, 454 S.W.2d 534 (Mo.1970); Clay v. Eagle Reciprocal Exchange, 368 S.W.2d 344 (Mo. 1963). It should be pointed out that the aforementioned cases are in the context of de novo review of court tried cases. Nevertheless, the rationale from which the attendant principles of review spring appears equally compelling regarding de novo review of "questions of 'constitutional fact'" in libel cases.

Attention now focuses on a de novo review of constitutional facts to determine

whether the trial court erred in sustaining the Star's motion for directed verdict at the close of Whitmore's evidence. An inescapable nexus exists throughout all of Whitmore's evidence which, in its totality, is common to this court's de novo determination regarding (1) the "clear and convincing" character of the evidence and whether, measured thereby, (2) the article was false, (3) the Star published the article knowing it to be false, (4) the Star published the article "with reckless disregard of whether it was false or not", and (5) the evidence "permits the conclusion" that the Star "in fact entertained serious doubts as to the truth" of the article.

■ With respect to the statements in the article attributed to Homer Ontman, Whitmore admitted he did not know what Ontman said, or did not say. Moreover, Whitmore introduced no evidence that Ontman did not make the statements in the article attributed to him. Under the most minimal burden of proof, much less the weighty burden of "clear and convincing" proof, Whitmore failed to prove that statements attributed to Ontman in the article had not, in fact, been made. Any attack made by Whitmore on the statements attributed to Ontman, in the article, was at best enigmatic. Essentially it consisted of Whitmore's attempt to introduce into evidence records of juvenile complaints against Ontman, a summary of testimony given under oath by Ontman and hearsay statements purportedly made by a Mr. Smith, all of which were rejected by the trial court. Suffice it to say, in the context of submissibility, Ontman was cleared by a grand jury of the juvenile complaints prior to the date the alleged libelous article was published, the date of the testimony given by Ontman in the summary post dated publication of the alleged libelous article, and the Smith statements failed to constitute evidentiary support of constitutional malice since there was no evidence that the Star or its scrivener had knowledge of them prior to publication of the article.

Thus the de novo review imposed on this court is substantially contracted and now converges on those portions of the article attributed to Whitmore and the substance of Ontman's statements. Whitmore denied he told the scrivener of the article that he "agreed to the substance of the conversations" reported in the article (quoting Ontman) as having occurred between him and Ontman; he denied he told the scrivener of the article he had made the original offer (that the boy would be returned to Ontman if he resigned his position with the juvenile court and quit talking); he denied he told the scrivener of the article "if things quieted down" the boy might be able to go back to the Ontman home; and he denied he told the scrivener of the article the boy had been placed in another home "on his recommendation". Additionally, Whitmore testified that all of the aforementioned was false and defamatory; also the statement in the article that the boy was being used as a "pawn"—"to hold down adverse publicity about the Jackson County parental school" appearing in the lead paragraph of the article was false and defamatory. Whitmore also contended there was no factual foundation for the statements in the article attributed to Ontman.

■ In reviewing this matter de novo, as this court is compelled to do, Whitmore is not entitled to have the evidence viewed from the standpoint most favorable to him, nor is he entitled to the benefit of all reasonable inferences. To the contrary, the crux of appellate disposition is whether the evidence, cumulatively, satisfies the weighty burden of "clear and convincing" proof, and when measured by such standard so militates in Whitmore's favor regarding falsity of the alleged libelous article, its publication by the Star knowing it to be false, or its publication by the Star "with reckless disregard of whether it was false or not", and, if false, that it "permits the conclusion" that the Star "in fact entertained serious doubts as to the truth" of the article, that the trial court erred in not

submitting the case to the jury. There is substantially more than a dearth of evidence, as well as a genuine question as to the credibility of Whitmore as a witness, militating against Whitmore regarding part, if not all, of the aforementioned and certainly sufficient evidence to preclude Whitmore from meeting the weighty burden of "clear and convincing" proof as to part, if not all, of the requirements necessary to prove constitutional malice.

Prior to the time the boy was removed from the Ontman home, Whitmore believed the boy was making good progress in the Ontman home. The boy's removal was precipitated by the fact that a grand jury was investigating complaints against Ontman leveled by several juveniles. Whitmore, when he picked the boy up at the Ontman home, indicated to Ontman that Ontman had done a pretty good job with the boy and he would not be against recommending that the boy be returned to the Ontman home if Ontman was cleared by the grand jury. Later Whitmore told Ontman that return of the boy was contingent on three conditions, namely: (1) the result of the grand jury investigation of Ontman, (2) the wishes of the boy, and (3) the approval of the Juvenile Court.

On or about July 20–21, 1967, Whitmore learned that Ontman had been cleared by the grand jury. Ontman called Whitmore and sought return of the boy. Whitmore responded to the request by reiterating the three conditions mentioned above. Whitmore further testified that at that period of time he was seriously considering returning the boy to the Ontman home, and although he did not have any authority to do so, he could have made a recommendation, and such a recommendation made by him would probably have been followed. Whitmore also told Ontman on the July 20–21 occasion that he would interview the boy to determine his wishes regarding return to the Ontman home.

On July 22, 1967, Ontman advised Whitmore there was going to be more publicity concerning conditions at the Jackson County juvenile facilities. Whitmore admitted that the reason he did not bring the boy in for an interview to ascertain his wishes about returning to the Ontman home was because of Ontman's statement to him there was going to be more publicity about conditions existing at the Jackson County juvenile facilities. At this point of time Whitmore began developing reservations about the return of the boy to the Ontman home. On July 24, Ontman asked Whitmore's immediate superior, in Whitmore's presence, if his (Ontman's) chances of getting the boy back would be any better if he resigned.

On the morning of July 27, 1967, Whitmore received a call from the scrivener of the article, during which time, according to Whitmore, the conversation related to his telling the scrivener that he had no knowledge that the boy had been returned to the detention home because of troubles in the foster home the boy had been abiding in, that he had no plan to return the boy to the Ontman home, and that any further questions concerning the placement of the boy could not be discussed without approval of the Juvenile Court. Whitmore's testimony concerning the telephone conversation can be fairly characterized as somewhat vague and chronologically unconnected. On direct examination, however, he admitted that he had used the word "pawn" during his telephone conversation with the scrivener of the article.

Sometime around noon July 27, 1967, the scrivener of the article had a telephone conversation with the Judge of the Juvenile Court of Jackson County, at which time the scrivener of the article related to the judge the purported conversations with Whitmore indicating Ontman's refraining from criticism of juvenile facilities in Jackson County would be a determinative factor as to whether the boy would be returned to Ontman's home. The judge responded to the aforementioned by saying that such was "one hundred and eighty degrees different from what Mr. Whitmore

told me a little while ago". The following day, same being the day preceding publication of the article in question, the judge ordered a formal inquiry into the matter reported by the scrivener of the article to the judge over the telephone. The fact that a formal inquiry was ordered certainly gives credence to the alleged libelous article that was subsequently published, and, standing alone, makes baseless any contention that the scrivener of the article "entertained serious doubts as to the truth" of the publication.

Whitmore consistently and vehemently denied that he ever made an offer to Ontman concerning return of the boy. However, Whitmore testified he could not "recall specifically" and "would have to by-pass" that portion of the article making reference to his being asked "what Ontman's resignation had to do with the welfare of the boy".

Additional testimony by Whitmore can fairly be summarized as having the effect that he cemented his decision not to recommend return of the boy to the Ontman home because Ontman told him there was going to be more publicity about the juvenile court facilities; moreover, that he made no effort to bring the boy in to determine the boy's wishes as to whether or not he wanted to return to the Ontman home.

Whitmore admitted that he "approved" placement of the boy in the foster home, although he denied such was a "recommendation" on his part. Such seems to be more of a play on words than substance.

The record in the case is replete with overt indications that Whitmore was subjected to a vigorous, in-depth cross examination concerning all aspects of his testimony on direct examination. Whitmore's reaction to, handling of and response thereto was such that the trial court, on at least three occasions, admonished Whitmore to answer questions put to him by the Star's counsel.

On his own volition, Whitmore, by means of answers to interrogatories he submitted to the Star, offered as a part of his case that prior to publication of the article the scrivener had approximately fifteen meetings or conferences with Ontman, varying in length from five minutes to an hour; that the truth and veracity of the statements contained in the article were checked and verified by the scrivener by means of conversations with Homer Ontman, Whitmore, a member of the County Court of Jackson County, the Judge of the Juvenile Court of Jackson County, the head of the Jackson County parental school, the chief probation officer of the Jackson County Juvenile Court and by checking the official records of the Juvenile Court of Jackson County; further, that the scrivener of the article had no information from any of such sources of inquiry that the quoted statements attributed to Whitmore were not true prior to publication of the article in question.

■ Viewing Whitmore's evidence in its totality, there is no escape from the ultimate conclusion that it falls short of "clear and convincing" proof that the article published by the Star was false, or that the Star knowingly published a false article. The totality of Whitmore's evidence falls even shorter of "clear and convincing" proof that the Star published the article with "reckless disregard of whether it was false or not", or that the Star, "in fact, entertained serious doubts as to the truth" of the article. Consequently, the trial court did not commit error in sustaining the Star's motion for a directed verdict at the close of Whitmore's evidence.

Whitmore also asserted on appeal that the trial court erred in its rulings on certain evidentiary matters, but candidly and forthrightly conceded that such were moot if the trial court's sustainment of the Star's motion for a directed verdict at the close of his evidence was correct. Having held that the ruling of the trial court in the respect mentioned was correct, a deter-

mination of the evidentiary matters raised by Whitmore becomes unnecessary to properly dispose of this appeal.

Although this case is not one presenting a delicate balance between the existence or non-existence of constitutional malice—nor are the following observations directed specifically or generally to the Star—the present spectrum reflected by the law of libel is far from palatable to the ordinary man on the street. This pervasive feeling should, hopefully, be viewed as a "bellwether" by the news media whereby they discipline themselves regarding licentious and irresponsible reporting. Impressing a point of view at the expense of factual accuracy is the antithesis of First Amendment responsibility; likewise, sensationalism without caution for truth; likewise, weighting a point of view by excluding opposing or contradictory matters. The news media itself bears the greater responsibility, even more than the courts, to preserve the First Amendment's guarantee of freedom of speech and press. Self discipline on the part of the news media, and it alone, can give purity of meaning to the First Amendment and justification for its literal interpretation and application. On the other hand, courts, in their disposition of libel cases must vigilantly guard against succumbing to a decisional atmosphere that known instances of media irresponsibility stand as justification to debilitate or destroy the First Amendment's guarantee of freedom of speech and press.

Judgment is affirmed.

All concur.