Gary D. WARNER, Appellant,

v.

The KANSAS CITY STAR CO.,
Respondent.

No. WD 37530.

Missouri Court of Appeals,
Western District.

Jan. 20, 1987.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 3, 1987.

Application to Transfer Denied
April 14, 1987.

Thaine Q. Blumer, Kansas City, for appellant.

William L. Turner, Bernard J. Rhodes and Anita R. Estell, Kansas City, for respondent.

Before TURNAGE, P.J., and
SHANGLER and KENNEDY, JJ.

KENNEDY, Judge.

Plaintiff Gary D. Warner had a jury verdict for $200,000 compensatory damages on

his libel claim against the Kansas City Star Company, and $75,000 punitive damages. The trial court set the verdict aside and entered judgment for defendant on the ground that plaintiff had failed to prove defendant's actual malice in publishing the alleged libel and hence had failed to make a submissible case. Plaintiff has appealed.

Plaintiff had been the outdoor editor of the defendant newspaper, who was discharged by the newspaper for the alleged violation of the newspaper's rule against accepting gifts or favors from persons whose products or services might be the subjects of newspaper reports. Warner's superiors had claimed to have reason to believe that Warner had accepted the free use of a four-wheel drive International Scout from an International Harvester dealer, as well as the free use of a fishing boat and motor and of a Winnebago Motor Home. Following Warner's discharge on February 12, 1980, the newspaper on the following Sunday, February 17, published a news report of Warner's discharge and the reasons therefor. In connection therewith, using the discharge as a springboard, it published a wide-ranging report on the practice of merchants and manufacturers of sporting goods and services in furnishing gifts and favors to outdoor writers. It was in these articles that the defamatory material appeared. We will presently examine the newspaper articles more closely.

### 1. *Plaintiff as a "public figure".*

■ The threshold question in this case is whether plaintiff was a public figure. The trial court ruled in limine that plaintiff was a "limited purpose public figure". If the court was correct in this ruling, and if plaintiff was indeed a limited purpose public figure, the newspaper is protected by the First Amendment from liability for damages for defamation, unless the defamatory statements were published with actual malice on the part of the newspaper— that is, with knowledge that the statements were false, or with a reckless disregard as to whether they were true or false. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *McQuoid*

*v. Springfield Newspapers, Inc.,* 502 F.Supp. 1050, 1054 (W.D.Mo.1980).

We conclude as did the trial judge that Warner for the purposes of the alleged libel was a limited purpose public figure. For seven years he had been the outdoor editor of a metropolitan daily newspaper, with a weekly circulation of 250,000–400,000 and a Sunday circulation of 400,000–500,000. In that capacity he had regularly written prominently featured articles for the outdoor section of the newspaper, of which he was identified, by name and title, as the author. The outdoor section was concerned with such subjects as fishing, hunting, boating and camping. Warner was well known to a wide audience of people interested in the outdoor life. He said in his trial testimony that he had gotten "heavily involved" in several conservation campaigns. (An admiring reader's letter to the newspaper after Warner's dismissal said: "He gained national recognition with his series concerning the Meramec River". Another referred to his support of "controversial conservation issues".) Over a span of four or five years he had received recognition for his writing and for his promotion of conservation causes. He had received the "Deep Woods Award" as the best newspaper conservation writer of the United States, and the "Deep Woods Man of the Year Award" as the best overall media conservation communicator in the nation. The same year as the "Deep Woods" awards he received the "Lawrence Water Conservation Award", and the next year the "C.R. (sic) Club's Conservation Communicator of the Year" award. He had been president for two years and board chairman for two years of the Kansas Outdoor Writers Association. A boat dealer considered it to be of benefit to have the name of "Gary D. Warner" painted prominently on the side of a bass boat used in a popular bass fishing tournament.

The evidence projects a picture of a person who "commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of the defamatory state-

ments". *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) (quoting *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)).

Furthermore, influence over the attitudes and beliefs of others in the field of plaintiff's credentials, was of value to him as a professional outdoor writer. His authority, the weight of his views, increased with his fame. It is inherent in his position that he invited public attention to himself and to his views. These factors are taken into account in weighing whether one is a public figure, and, in Warner's case, are indicia of that status. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 346, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974); *Lerman v. Flynt Distributing Co.,* 745 F.2d 123, 136–37 (2d Cir.1984), *cert. denied* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Maule v. NYM Corp.,* 54 N.Y.2d 880, 429 N.E.2d 416, 417, 444 N.Y.S.2d 909, 910 (1981).

## 2. *Actual malice of newspaper.*

Having held, in agreement with the trial court, that Warner was a public figure, it then is incumbent upon him, under the requirements of the First Amendment as interpreted by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Curtis Publishing Co. v. Butts,* supra, to have proved that the defamatory publication was with actual malice on the part of the defendant newspaper. By this is meant that the newspaper published the alleged defamatory statement knowing it to be false, or with a reckless disregard whether it was true or

false. *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), adds "made with [a] high degree of awareness of ... probable falsity," and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), requires that the defendant "in fact entertained serious doubts as to the truth of his publication."

The verdict-directing instruction in this case, in line with the trial judge's in limine ruling that defendant was a limited purpose public figure, required the jury to find actual malice on the part of the newspaper. The instruction followed M.A.I. 23.06(2) (Modified).[1] The jury by its verdict for plaintiff impliedly found that defendant published the defamatory statement or statements with actual malice.

Two alleged libels were submitted to the jury by the plaintiff's verdict-directing instruction, in the disjunctive. One was that "Warner had misrepresented the arrangements under which he obtained the vehicle." The other was that Warner had violated the newspaper's ethics code. We will first take up the misrepresentation charge, for it is around that issue that the controversy mainly revolves.

## 3. *Judicial review of evidence of actual malice.*

In our review, we are obliged to determine for ourselves the presence of actual malice by an independent review of the entire record. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1964–1965, 80 L.Ed.2d 502 (1984); *Long v. Arcell,* 618 F.2d 1145, 1147 (5th Cir.1980), *cert. denied,*

---

1. Your Verdict must be for plaintiff on this claim of libel if you believe:

First, defendant published a newspaper article containing the statement "Warner had misrepresented the arrangements under which he obtained the vehicle," and

Second, such statement was false, or

Third, defendant published the newspaper articles identified as Exhibit 19, and

Fourth, such articles, when read together, implied plaintiff violated the Kansas City Star Ethics Code, and

Fifth, such implication was false, and

Sixth, defendant published either the statement referred to in paragraph First, or the implication referred to in paragraph Fourth, with knowledge that it was false, or with reckless disregard for whether it was true or false at a time when defendant had serious doubts as to whether it was true, and

Seventh, such statement or implication tended to deprive the plaintiff of the benefit of public confidence and social associations, and

Eighth, such statement or implication was read by the public, and

Ninth, plaintiff's reputation was thereby damaged.

449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981); *Whitmore v. Kansas City Star Co.,* 499 S.W.2d 45, 49 (Mo.App.1973). In this respect First Amendment cases are unlike other jury-tried cases, where the jury's verdict is sustained if, disregarding all contrary evidence and inferences therefrom, the verdict is supported by evidence in the record viewed most favorably to the verdict. *See Machens v. Machens,* 263 S.W.2d 724, 734 (Mo.1954); *Marshall v. Edlin,* 690 S.W.2d 477, 479 (Mo.App.1985). In First Amendment cases, the reviewing court must make an independent review of the evidence to determine for itself whether actual malice was present. We will return to the subject of standard of review presently.

### 4. *The newspaper articles.*

We now look more closely at the alleged libelous articles and the evidence of events leading up to their publication.

The offending newspaper articles appeared in *The Kansas City Star* for Sunday, February 17, 1980. On the front page, under the heading "Ethics and Outdoor Writing", there was in bold-faced print an introduction to two articles which followed. The introduction summarized the two articles, the theme of which was that many outdoor writers received gifts, favors and discounts from sellers of outdoor sports equipment. The sellers hoped to receive favorable and prominent mention of their products by the outdoor writers. Whether the receipt of such favors actually did color the news coverage of the writer, there would be a public perception that his writing, as it related to the products of the benefactor, would not be wholly unbiased and objective. Many newspapers, including *The Kansas City Star,* had adopted codes of ethics which forbade the receipt of gifts, favors and discounts by its reporters and writers. It went on to say that "Gary D. Warner, the *Star's* outdoor editor since 1973, was dismissed from the staff Tuesday because he was caught up in a potentially compromising situation with a manufacturer"—and that the "Warner situation" had prompted reporters Rick Alm and Bill Norton to conduct an inquiry into the field,

the results of which were reported in the articles which followed.

Articles by Norton and Alm followed. Alm's was headlined: "Merchants Woo Writers With 'Freebie' Feasts". Norton's was headlined: "Some Outdoor Writers Accept Gifts, Discounts". The two articles reported numerous interviews with merchants and with various newspaper people about the subject. The articles commenced on the front page and continued on page 4 of the newspaper.

On page 5 of the newspaper was an article by Norton and Alm under the headline, *"Star's* Outdoor Editor Fired on Ethics Issue". This article purported to be a straightforward news account of the dismissal of Warner and of the events leading up to it. It was in this article that one of the alleged libelous statements appears. The statement was: "Davies changed his mind, however, [after initial conference with Warner, after which he decided not to discharge him] when reporters uncovered information suggesting that Warner had misrepresented the arrangements under which he obtained the vehicle."

Following the news account of Warner's dismissal was a "Letter from the Editor" by editor Michael J. Davies entitled: "Decision Came After 'Soul-Searching' ". It was a more or less personal account of the discharge from the editor's perspective. Following on the same page were two shorter articles. One was headed, "Freebies Anyone? Merchants Bait Hooks", and one was headed, "Probe Leads to *Star* Publisher", which reported that the newspaper publisher had received a discounted price on a fishing boat and motor.

### 5. *The evidence of truth or falsity, and of actual malice.*

The trial evidence brought out the following facts with respect to the newspaper articles and the events surrounding them:

Michael J. Davies, editor of *The Kansas City Star* and *Times,* received an anonymous note in the mail on January 30, 1980. Attached to the note was a recent article by Warner. The article was about the mer-

its of a four-wheel drive vehicle in rough terrain. It was in the outdoor section, which was devoted to coverage of a sports show in Kansas City—an exhibit of outdoor paraphernalia. The article specifically mentioned the International Harvester Scout in complimentary terms, and was accompanied by a picture of the Scout (although the pictured vehicle was not identified by name). The note charged that Warner was giving greater prominence to the Scout because he was receiving free use of the Scout.

Davies made inquiries and found that Warner was in fact driving a new Scout with dealer tags and with a price sticker on the window.

He summoned Warner to a conference in his office. Present besides himself and Warner were Scott Whiteside, administrative assistant to the editor and legal adviser, and Michael Waller, then managing editor of *The Kansas City Star.* The subjects under discussion were the anonymous note and the circumstances surrounding Warner's possession and use of the vehicle.

It is Warner's explanation of the arrangement under which he had the vehicle which is the main controversy between the parties, for upon this is based the statement in the newspaper report that Warner "misrepresented" the arrangement. There is no dispute in the evidence what the arrangement actually was. The dispute is whether Warner at the conference between himself, Davies, Whiteside and Waller misrepresented the arrangement. The ultimate question, though, is not whether he misrepresented it. The ultimate question is whether Davies, Whiteside and Waller *believed* at the time of the publication of the offending newspaper articles that he had done so. *Long v. Arcell,* 618 F.2d 1145, 1147 (5th Cir.1980), *cert. denied* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981). *See also Bartimo v. Horsemen's Benevolent & Protective Association,* 771 F.2d 894, 898 (5th Cir.1985), *cert. denied* —— U.S. ——, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986).

We might believe from the evidence that Warner in fact did not misrepresent the arrangement, and that the newspaper statement that he did was therefore false— yet unless the evidence shows with convincing clarity that Davies, Whiteside and Waller knew it was false, or that they were recklessly disregardful of its truth or falsity, and entertained serious doubts about its truthfulness, the action of the trial judge in setting aside the verdict of the jury and in entering judgment for the defendant must be approved. *Long v. Arcell, supra.* Of course, what Warner actually said in this conference, as disclosed by the evidence, is most persuasive evidence of what the others believed that he said. Warner's testimonial account of this conference is as follows:

"(Editor Davies) showed me the tear sheet and the anonymous letter that he had received. He asked me to explain the circumstances of my having a Scout. I told him that I had the Scout on loan from International Harvester, that I was making an attempt to and had planned to buy the vehicle eventually when I could ... He asked me about the insurance and maintenance on the Scout, who was paying that, and I told him that International Harvester was, that I wasn't ... They never needed repairs, I didn't have them that long. But I had never paid any maintenance ... or any insurance ... He asked me what arrangements I had for purchasing the vehicle ... I told him that I had been for some time making payments, as much as I could, to Dick Aubrey ... I told him Dick was currently working at International Harvester, that he was a good friend of mine. I told him that this was a private matter, that I was hiding this money away with Dick hoping to build up enough money to buy the Scout or at least to make a down payment ... I believe I made it clear to Michael Davies that Dick Aubrey was holding the money for me.

The fact of the matter was, as Warner explained in his trial testimony, he was making occasional deposits of funds with his long-time friend Aubrey in order to accumulate a sufficient amount to pur-

chase, or at least to make a down payment, on a Scout. Aubrey was not receiving the funds on behalf of International Harvester, but in his individual capacity. The reason for this procedure, as Warner explained in his testimony, was that he had no bank account and that support payments for his four children kept him financially strapped and that he was "hiding" these funds (from himself, we take it, and from his tendency to spend readily accessible money) as a saving device. He had commenced making these deposits in irregular amounts of $50 to $100 before Aubrey was employed by International Harvester. Aubrey's International Harvester employment had commenced only on November 1, 1979, three months before the discussion under scrutiny. The deposits were made in cash and Warner received no receipt from Aubrey. Neither of them kept any written record of the deposits. Aubrey comingled them with his own funds. Warner estimated that by the time of the discussion the accumulated amount had reached $975. (The funds were repaid to Warner by Aubrey on February 29, after Warner's discharge, by a check for $1,050.)

Davies' testimony on the trial was that Warner had said in the first conference that he was making payments of $100 per month to Aubrey, whom he identified as an employee of International Harvester. Davies testified, "He was using the two [i.e., Aubrey and International Harvester] interchangeably." Scott Whiteside testified as follows:

> "Gary says, Yeah, it's true that he had an International Harvester Scout and had been driving it for some time, but that he was—he didn't think there was anything wrong with that, he was paying for it. And Mike Davies said, 'Well, who are you paying?' He says, 'I'm paying International Harvester $100 a month for it.'

> "He says, 'Is there someone at International Harvester that can verify that?' And he said, 'Dick Aubrey is the guy I pay the money, give the money to and he is the sales manager.'"

Michael Waller, then managing editor of the *Star*, but editor of both the *Star* and *Times* at the time of trial (succeeding Davies, who had in the meantime resigned and had gone to another newspaper), also testified that Warner had described Aubrey as sales manager for International Harvester, to whom he was paying about $100 per month.

Davies, Whiteside and Waller understood, then, according to their testimony, that Warner was making $100 payments to the owner and seller of the Scout, on a rather vague lease-purchase arrangement. When Davies learned that Warner's "payments" were not being paid to International Harvester on the purchase price of the Scout, that they were not payments at all but were deposits being made with Aubrey as Warner's friend and safekeeper (and so within Warner's control), Davies believed that Warner had earlier "misrepresented" the arrangement under which he was using the vehicle.

6. *Standard of appellate review of evidence in jury-tried cases where trial judge has granted judgment N.O.V.*

Assuming that the newspaper's allegation of Warner's "misrepresentation" was false, and that in fact Warner had accurately and truthfully represented the arrangements under which he had possession of the vehicle, we must determine for ourselves upon an independent review of the entire record whether the evidence shows with convincing clarity that Davies, Whiteside and Waller knew that the statement was false, whether they entertained serious doubts about its truth, or whether they published it with reckless disregard to its truth or falsity.

We conclude, as did the trial judge, upon an independent review of the evidence, that the plaintiff has failed to show actual malice on the part of the newspaper with convincing clarity—failed, that is, to show that the newspaper knew the falsity of the offending statement, or published it with reckless disregard to whether it was true or not. This depends to a large extent on an assessment of witness credibility.

If one accepts as true Warner's testimonial account of what he said at the first conference in Davies' office, in the hearing of Davies, Whiteside and Waller, it would be a fair inference that they knew at the time of the publication of the defamatory report that it was false.

If on the other hand one takes Davies', Whiteside's and Waller's version of Warner's explanation of the arrangement under which he had the use of the Scout, then the offending statement was true or at least was believed by them to be true.

Plaintiff urges upon us that the issue is one of credibility of witnesses, and that our duty of independent review does not obviate the necessary practice of deference to the jury on the issue of credibility. He argues we must accept the credibility of Warner's version on the basis of the jury's finding.

But the trial judge, upon defendant's motion for judgment N.O.V., has expressly found the fact issue of actual malice contrary to the jury. To whose assessment of credibility, to whose weighing of the evidence for convincing clarity, do we defer, the judge's or the jury's? Whose fact finding do we review?

The judge's, we think, especially where, as here, the record indicates he made a purposeful review of the evidence and made an express finding upon the challenged constitutional fact. The jury after all has no advantage over the trial judge in seeing and hearing the witnesses. The cases speak usually of the duty of independent *appellate* review of the evidence to determine the presence of constitutional facts in First Amendment cases. No attention has been given to the trial judge's role in jury-tried First Amendment cases in reviewing the evidence on motion for new trial or on motion for judgment N.O.V., nor on the impact of his ruling thereon on our independent appellate review.[2] We think, however, that it is inherent in the relative positions of trial judge and appellate court with reference to the review of evidence in the usual jury-tried case, given the superimposed duty of judicial review of evidence in First Amendment cases, that it is the duty of the trial judge in First Amendment cases *initially* to review the evidence upon defendant's motion for judgment N.O.V., at least for the presence of actual malice (and other "constitutional facts", *see Whitmore v. Kansas City Star Co.*, 499 S.W.2d 45, 49 (Mo.App.1973)), and to make an express finding thereon.[3] That is exactly what the trial judge did in the present case. Our review, then, is of the trial court's fact finding upon the issue of actual malice, as if he had made the finding in a court-tried case. The standard of appellate review is thus stated in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499–500, 104 S.Ct. 1949, 1958–1959, 80 L.Ed.2d 502 (1984):

> Our standard of review must be faithful to both Rule 52(a)[4] and the rule of

---

**2.** This problem is involved in *Tavoulareas v. Piro,* 759 F.2d 90 (D.C.Cir.1985), which—at this writing is pending before the D.C. Circuit en banc after transfer from the panel which first heard and decided the case. *See* 763 F.2d 1472, 1481 (D.C.Cir.1985).

**3.** The trial judge is in familiar territory when he weighs conflicting evidence and assesses credibility even in jury-tried cases. His limited supervening fact-finding power is recognized in Rule 78.02, giving to him the authority to grant one new trial on the ground that the verdict is against the weight of the evidence. So large is his discretion in granting a new trial on that ground, we do not even review the order. In this First Amendment case, however, where judgment N.O.V. is granted on the ground of the verdict's being contrary to the weight of the evidence, we do review the judgment grant, as

we would not the grant of a new trial, but by the court-tried case standards.

**4.** Our corresponding rule to Federal Rule 52(a) is Rule 73.01(c)(1) and (2). It provides with respect to court-tried cases: "On appellate review: (1) The court shall review the case upon both the law and the evidence as in suits of an equitable nature. (2) Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." In *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), this is interpreted to mean "the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it

independent review applied in *New York Times v. Sullivan.* The conflict between the two rules is in some respects more apparent than real. The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record; Rule 52(a) never forbids such an examination, and indeed our seminal decision on the rule expressly contemplated a review of the entire record, stating that a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co., supra,* 333 U.S. [364] at 395, 68 S.Ct. [525] at 542 [92 L.Ed. 746 (1948)] (emphasis supplied). Moreover, Rule 52(a) commands that "due regard" shall be given to the trial judge's opportunity to observe the demeanor of the witnesses; the constitutionally-based rule of independent review permits this opportunity to be given its due. Indeed, as we previously observed, the Court of Appeals in this case expressly declined to second-guess the district judge on the credibility of the witnesses.

■ The trial court found in this case that the evidence failed to meet the plaintiff's onerous burden to prove with convincing clarity the actual malice of the newspaper in publishing the defamation. We are unable to conclude, deferring to the trial judge's assessment of credibility, and to his estimate of the weight of the evidence, that the trial judge was wrong in this finding. The testimony of Davies, of Whiteside and of Waller (of Warner's explanation of the payments to Aubrey, and of their interpretation thereof) was positive, direct, coherent and plausible. Their position was consistent with the position taken by Davies as early as March 4, 1980, in a service letter requested by Warner. Nor does one need wholly to reject Warner's testimony in order to reach that conclusion. If his explanation to Davies and the others had been

only slightly less explicit than his trial account of it, if he had been only somewhat vague, or equivocal, or ambiguous, it is not likely that his hearers would have grasped this extraordinary arrangement. They would instead have given it the more likely (and, at that time, the more favorable to Warner) interpretation that the payments were a quid pro quo for the machine or for its use.

### 7. Newspaper allegation of violation of ethics code.

■ The second of the disjunctive submissions—that the February 19 articles implied that Warner had violated the newspaper's code of ethics—needs only the briefest discussion. It is not disputed that he had had the Scout two or three weeks without any obligation to rent or purchase it. In preceding months he had had two other Scouts on loan for shorter lengths of time. That this constituted an "overstepping of the *Star*'s ethical guidelines", as the newspaper report put it, was at least arguably true. The trial court found on defendant's motion for judgment N.O.V. that the evidence did not show with convincing clarity that the newspaper at the time of the publication knew that it was false or that it was recklessly disregardful of the statement's truth or falsity. Upon an independent review of the evidence, we conclude that the trial judge was correct.

The judgment is affirmed.

All concur.

---

is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Id.* at 32.