Chad and Terri SIGAFUS, Appellants,

v.

ST. LOUIS POST–DISPATCH, L.L.C., Pulitzer Publishing Company, Pulitzer Missouri Newspapers, Inc., Pulitzer, Inc., Joe Holleman, and Carolyn Tuft, Respondents.

No. ED 81268.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 1, 2003.

Application for Transfer to Supreme Court Denied July 3, 2003.

Robert Chase Seibel, Seiber & Eckenrode Law Offices, Clayton, MO, for Appellants.

Benjamin Alan Lipman, Lewis, Rice & Fingeresh Offices, St. Louis, MO, for Respondents.

SHERRI B. SULLIVAN, Judge.

*Introduction*

Chad and Terri Sigafus (collectively Appellants) appeal from the trial court's Summary Judgment in favor of St. Louis Post–Dispatch, L.L.C., Pulitzer Publishing Company, Pulitzer Missouri Newspapers, Inc., Pulitzer, Inc., Joe Holleman and Carolyn Tuft (collectively Respondents) and against Appellants. We affirm.

*Factual and Procedural Background*

On March 5, 2000, the St. Louis *Post–Dispatch* published an article reporting on a conference of the Christian Identity Movement held over the weekend of February 25–27, 2000 in Branson, Missouri called the "Gospel Gathering." Chad Siga-

fus was the sound engineer for the gathering. Appellants performed music at the event, sold compact discs and cassette tapes of their music at the event and distributed a catalogue of their music available for purchase as well. The article stated that the Christian Identity Movement is comprised of white supremacists and anti-Semites, and listed Appellants as affiliates of the Christian Identity Movement.[1] Thereafter, Appellants brought a cause of action against Respondents for defamation, claiming that the article falsely affiliated them with the Christian Identity Movement. Respondents moved for Summary Judgment, claiming that Appellants cannot bring a cause of action for defamation against Respondents based on the article, because Appellants are public figures, and Appellants presented no evidence of actual malice. The trial court granted Respondents' Motion for Summary Judgment based on these arguments. Appellants appeal from that judgment, presenting two points on appeal.

*Standard of Review*

Appellate review of a trial court's grant of summary judgment is essentially de novo. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.banc 1993). Summary judgment will be upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377. One way a defending party may establish a right to judgment as a matter of law is by showing undisputed facts that negate any one of the elements of the plaintiff's cause of action. *Id.* at 381.

Appellants assert that certain items of evidence that Respondents have submitted

1. Appellants are listed in a table of 17 Missouri affiliates as pastor or owner of Teeter-    Tot Records in Couch, Missouri.

on appeal in support of their response "are not matters within the scope of this appeal." Appellants argue that these items were the subject of a motion to strike they submitted to the trial court. The trial court did not rule upon the motion because it considered the motion to be moot, as the court did not rely on any of the items contained in the motion when granting Respondents' Motion for Summary Judgment. Appellants claim that "it is a fundamental concept of appellate review that an appellate court 'will not consider questions not ruled upon by a District Court,'" citing *Govero v. Standard Oil Co.*, 192 F.2d 962, 963–64 (8th Cir.1951).

Appellants' reliance on *Govero* is misplaced, as it involves issues not presented to the trial court, and thereby not preserved for appeal.[2] The instant case involves items of evidence, not issues, which in fact were presented to the trial court.

■ *De novo* review means that the criteria that we use on appeal for testing the propriety of summary judgment are no different from those that are employed by the trial court to determine the propriety of sustaining the motion initially. *ITT*, 854 S.W.2d at 376. When the appellate court reviews a summary judgment, it looks to the *entire record*, just like the trial court did, to determine if there is any issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Dial v. Lathrop R–II School Dist.*, 871 S.W.2d 444, 446 (Mo.banc 1994). The entire record in this case includes the evidentiary items about which Appellants complain.

Further, the propriety of summary judgment is purely an issue of law and the appellate court need not defer to the trial

court's order granting summary judgment. *Stone v. Crown Diversified Industries Corp.*, 9 S.W.3d 659, 664 (Mo.App. E.D. 1999). A trial court's order granting summary judgment can be affirmed on appeal on an entirely different basis than that posited at trial. *ITT*, 854 S.W.2d at 387–388.

Accordingly, we reject Appellants' argument that the evidentiary items at issue are not within the scope of this appeal.

### Point I

In their first point, Appellants contend that the trial court erred in granting Summary Judgment in favor of Respondents because Appellants are not public figures in that Appellants have insufficient access to the media, did not voluntarily rise to the forefront or seek to influence the outcome of the controversy, are not prominent as to the issues raised, and merely sought to promote their wholesome music by appearing at the Gospel Gathering.

### Discussion

■ The elements of defamation in Missouri are: 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation. *Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 70 (Mo.banc 2000).

*Warner v. Kansas City Star Co.*, 726 S.W.2d 384 (Mo.App. W.D.1987) is the most relevant Missouri case concerning who is a public figure for defamation purposes. As it was in *Warner*, 726 S.W.2d at 385, the threshold question in this case is whether Appellants are public figures. If Appellants are public figures, Respondents

---

**2.** Although Appellants have cited a federal case, this rule happens to apply to state courts as well.

are protected by the First Amendment from liability for damages for defamation, unless the defamatory statements were published with actual malice on the part of Respondents—that is, with knowledge that the statements were false, or with a reckless disregard as to whether they were true or false. *Id.*, citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and *McQuoid v. Springfield Newspapers, Inc.*, 502 F.Supp. 1050, 1054 (W.D.Mo.1980).

In *Warner*, the plaintiff Gary D. Warner (Warner) was an outdoor writer and editor for the *Kansas City Star*. Warner sued the newspaper for libel when it published an article on the practice of merchants and manufacturers of sporting goods in furnishing gifts to outdoor writers, stating that reporters uncovered information that Warner had misrepresented the arrangements under which he had obtained a vehicle as a gift from a company he covered as a writer and editor. The Western District made the following findings in concluding that Warner was a limited purpose public figure for purposes of the alleged libel:

> We conclude, as did the trial judge that Warner for the purposes of the alleged libel was a limited purpose public figure. For seven years he had been the outdoor editor of a metropolitan daily newspaper, with a weekly circulation of 250,-000–400,000 and a Sunday circulation of 400,000–500,000. In that capacity he had regularly written prominently featured articles for the outdoor section of the newspaper, of which he was identified, by name and title, as the author. The outdoor section was concerned with such subjects as fishing, hunting, boating and camping. Warner was well known to a wide audience of people interested in the outdoor life.... Over a span of four or five years he had received recognition for his writing and for his promotion of conservation causes....

> The evidence projects a picture of a person who "commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of the defamatory statements".

> Furthermore, influence over the attitudes and beliefs of others in the field of plaintiff's credentials, was of value to him as a professional outdoor writer. His authority, the weight of his views, increased with his fame. It is inherent in his position that he invited public attention to himself and to his views. These factors are taken into account in weighing whether one is a public figure, and, in Warner's case, are indicia of that status. [citations omitted].

*Warner*, 726 S.W.2d at 385–386.

■ In the instant case, Appellants are, in their own words, nationally known recording artists. Appellants own and operate a business called Teeter–Tot Records and use this label to record and market their music. Appellants have sold thousands of cassette tapes and compact discs of their music in the United States, Canada, England, Ireland and Australia. Since at least 1990, Appellants have regularly performed live on stage throughout the United States.

Appellants concede that as of March 5, 2000, the date of publication by Respondents in this case, Appellants had a national reputation as performers of children's music. Silo Music, which is a major nationwide distributor of children's music, Rounder Records, and several other distributors promoted and sold Appellants' music. As of March 5, 2000, Appellants had sent out a large amount of promotional materials and sample recordings to promote themselves and their careers to the

public. Appellants' first album was in approximately two hundred stores nationwide. Appellants now have approximately 15 albums. Newspapers and trade publications review Appellants' music, including *Family Fun* magazine, *Choice Music for Kids* magazine, *Billboard*, *Booklist*, and *Christian Parenting Today*. Appellants solicited these reviews by sending cuts of recordings to these magazines. Appellants have played alone and with other performers such as Leon Redbone and the Marshall Tucker Band. Appellants have frequently provided interviews to newspapers, including the Chicago *Tribune*, and radio stations, including WGN in Chicago, while visiting cities to perform. Terri Sigafus has written three children's books, available for sale to the public. She has also created two videotapes for children, similar to a Mr. Rogers program, in which she appears as Claire LeBear. These videotapes are also promoted and sold to the public.

It is clear to us that like Warner, Appellants were well known to a wide audience of people interested in religious and children's music.[3] Also, like Warner, over a span of several years Appellants have sought and received national recognition for their songs and musical performances. Appellants also sought and were granted access to the media when they wanted. We find that here, like in *Warner*, the evidence projects a picture of people who "commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of the defamatory statements." *Warner*, 726 S.W.2d at 385–386. Also similar to the Western District's findings as to Warner, it is inherent in

Appellants' activities that they invite public attention to themselves and their views, because of the religious nature of their public performances, as well as the cassette tapes and compact discs they disseminated nationally, and the interviews they sought and were granted. These factors are taken into account in weighing whether one is a public figure, and, in Appellants' case, are indicia of that status.

Appellants attempt to distinguish *Warner* by stating that Warner was a limited purpose public figure in the area of outdoor life, and thus statements regarding his termination were related to his credibility in the field that he gained notoriety. Appellants argue that the statements published by Respondents in this case had nothing to do with Appellants' production of children's music. On the contrary, the statements made about Warner were that he made misrepresentations regarding an automobile he took as a gift from a company he covered as a writer and editor, and that taking gifts from companies was a problem. The statements had nothing to do with outdoor life per se. Appellants attempt to equate bribery and/or kickbacks with the outdoor life, which is ludicrous

In properly following the reasoning of *Warner*, we conclude that Appellants' status as limited public figures does not limit the statements made about Appellants by Respondents to those concerning only children's music.

Not only were Appellants limited public figures in their own right, but they also interjected themselves into the Christian Identity Movement controversy, as evidenced by the following facts.

---

**3.** We find the distinction between writing and editing articles about outdoor life, and writing, singing and editing songs about religion, to be a distinction without a difference in this case.

Appellants have on numerous occasions voluntarily and without a performance fee, as Chad Sigafus confirms in his deposition, performed music onstage at public events featuring Christian Identity Movement speakers. In 1996, Chad Sigafus acted as videographer and principal editor of a videotape, prepared for public sale, on which he also performed, singing "The Truth will set you free" as the closing anthem, entitled "IDENTITY, Identifying God's Chosen" (Identity Tape). In his deposition, Chad Sigafus testifies as to his involvement as videographer and editor, as well as performer, in creating the Identity Tape. The Identity Tape's jacket states that it is a "58½ minute documentary professionally produced and shown to millions of Americans over Cable television, home video sales and rentals." The Identity Tape espouses the Christian Identity Movement's views and values, including several speakers who proclaim whites as God's chosen people and condemn Jews, non-whites and whites who associate with non-whites. We need not go into the details of the views espoused by the Identity Tape speakers and participants, who are named below. Suffice it to say the views are clearly racist and anti-Semitic. These same speakers and participants organized, promoted or spoke at events at which Appellants later publicly performed and participated, as set out below.

Throughout 1995 and 1996, Appellants regularly attended and performed during services at the church of Christian Identity Movement pastor Everett Ramsey (Ramsey), the producer of the Identity Tape. In the summer of 1996, Appellants performed at a Bible camp organized by Pete Peters (Peters), which included Ramsey and David Barley (Barley) as speakers. Peters and Barley were involved in the production of the Identity Tape as well. In the fall of 1996, Appellants performed at a gathering at which Ramsey and Ted Weiland (Weiland) spoke. Although Weiland's views are not presented on the Identity Tape, he voiced them at the 1998 and 1999 Gospel Gatherings, as contained in the audiotapes of those events. These views include that God's laws require that civil leaders be white, Christian men, that whites have been duped into thinking that the world is overpopulated, and that whites should have eight children per couple so whites can take America back.

In April 1997, Appellants appeared at a conference held in Branson hosted by Ramsey at which Peters spoke. In August 1997, Appellants appeared at an America's Promise Gathering in Albuquerque, New Mexico, along with Barley, Ramsey and Peters. In February 1998, Appellants performed at the first of four Songs for His People Gatherings in Branson. Weiland and James Bruggeman (Bruggeman), the moderator of the Identity Tape, spoke at the event. In May 1998, Appellants performed live in Indianapolis at a gathering sponsored by Weiland, at which Bruggeman spoke. In February 1999, Appellants performed at the second Songs for His People Gathering in Branson, at which Weiland spoke. In the summer of 1999, Appellants performed at the third Songs for His People Gathering in Branson, at which Weiland was the main speaker. In September 1999, Appellants performed in Estes Park, Colorado, at a gathering sponsored by Weiland.

The views presented in the Identity Tape and espoused by its creators and participants are clearly racist and anti-Semitic, and therefore controversial. Also clear is that Appellants interjected themselves into this controversy by their participation in the creation of the Identity Tape, a "58½ minute documentary professionally produced and *shown to millions of Americans over Cable television, home video sales and rentals*," and by

their frequent performance, as *"nationally known recording artists,"* in their own words, at subsequent gatherings of Identity Tape speakers and creators.

For the foregoing reasons, we find that Appellants are limited purpose public figures, and thus the trial court did not err in so finding. Point I is denied.

### Point II

In their second point, Appellants maintain that the trial court erred in awarding Summary Judgment to Respondents because Respondents published the articles in question with actual malice in that Respondents falsely attributed the source of their information to the Southern Poverty Law Center and the FBI, failed to retract their false statements, preconceived the story line prior to publication, and misstated the evidence to make it seem more convincing than it was.

### Discussion

■ As noted in our discussion of Point I, because Appellants are public figures, Respondents are protected by the First Amendment from liability for damages for defamation, unless the defamatory statements were published with actual malice on the part of Respondents—that is, with knowledge that the statements were false, or with a reckless disregard as to whether they were true or false. *Warner,* 726 S.W.2d at 385; *Gertz,* 418 U.S. at 334, 94 S.Ct. 2997; *McQuoid,* 502 F.Supp. at 1054.

■ At the summary judgment stage in a defamation action which has constitutional implications, a public figure plaintiff is required only to submit evidence which shows a genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity. *Bauer v. Ribaudo,* 926 S.W.2d 38, 42 (Mo. App. E.D.1996).

Appellants maintain that Respondents conceded that they falsely attributed the source of their information that Appellants were affiliates of the Christian Identity Movement to the Southern Poverty Law Center, and that this concession alone suffices to create a disputed issue of material fact on this issue, making summary judgment improper.

■ Appellants fail to present any evidence that this incorrect attribution is more than a mistake, and was done with actual malice. Negligence is "constitutionally insufficient to show the recklessness that is required for a finding of actual malice." *New York Times Co. v. Sullivan,* 376 U.S. 254, 286–88, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Glover v. Herald Co.,* 549 S.W.2d 858, 861 (Mo.banc 1977).

Additionally, Appellants present no evidence that Respondents knew of the inaccuracy of their source attribution at the time the article was published. This showing is a requirement for actual malice. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *New York Times Co.,* 376 U.S. at 286–88, 84 S.Ct. 710; *Glover,* 549 S.W.2d at 861.

Appellants also contend that the articles imply that the FBI determined Appellants to be members of the Christian Identity Movement. However, Respondents maintain that the FBI's Megiddo report, on which Respondents relied for their generalized descriptions concerning the Christian Identity Movement, did not mention Appellants' role in the Christian Identity Movement, nor did Respondents' articles suggest that it did. Further, Respondents presented evidence that they relied on sources other than the FBI to ascertain Appellants' role in the Christian Identity Movement. These sources included John Hickey (Hickey), the director of Progressive Vote; Hickey and Scott Moore

 

(Moore), of the Missouri Citizens Education Fund; David Warren (Warren), Regional Director of the Anti–Defamation League; Larry Giddens (Giddens), who had attended Christian Identity Movement events and knew that Appellants were close to the Farnums, whose organization Songs for His People was a known Christian Identity Movement affiliate and the promoter of the 2000 Gospel Gathering; as well as Tuft's personal observations of Appellants' activities and role at the 2000 Gospel Gathering. Based on these sources of information and personal observations, Respondents maintain that they honestly believed when they published the article, and still do believe that Appellants were and are affiliates of the Christian Identity Movement.[4]

Because Appellants have not presented sufficient evidence that Respondents printed the article at issue with actual malice, Point II is denied.

### Conclusion

The judgment of the trial court is affirmed.

WILLIAM H. CRANDALL, JR., P.J., and GLENN A. NORTON, J., concur.

---

**4.** We note that the trial court found, and this finding still stands, that there exists a material issue of fact as to whether Appellants are, in fact, Christian Identity Movement affiliates.